[No. H011486. Sixth Dist. Jan. 6, 1995.]

THE PEOPLE ex rel. DEPARTMENT OF TRANSPORTATION, Plaintiff and Appellant.
MIYOKO YUKI et al., Defendants and Respondents.

## COUNSEL

Morgan, Ruby, Schofield, Franich & Fredkin, Allen S. Ruby and William Siamas for Plaintiff and Appellant.

Marer, Marer & Schuck, Gerald Z. Marer, Turner & Mulcare, Ronald J. Mulcare and William J. Turner for Defendants and Respondents.

## OPINION

**BAMATTRE-MANOUKIAN, J.**—The State of California (the State), the plaintiff in this eminent domain action, paid the property owners a judgment of $1,970,076.60 following a jury trial which determined the question of just compensation for the taking of property. In a subsequent motion by the property owners to recover reasonable expenses of litigation, pursuant to Code of Civil Procedure section 1250.410,[1] the court awarded an additional $1,452,846.25 in litigation expenses, including attorney fees in the amount of $1,303,714.30.

The State appeals from the order awarding litigation expenses, challenging both the property owners' entitlement to expenses under section 1250.410 and also the amount of expenses awarded, in particular the attorney fee award. We will affirm the order of entitlement to litigation expenses, but we reverse the award of attorney fees on the ground that it includes an improper surcharge.

---

[1]Code of Civil Procedure section 1250.410 provides, in relevant part:

"(a) At least 30 days prior to the date of the trial on issues relating to compensation, the plaintiff shall file with the court and serve on the defendant its final offer of compensation in the proceeding and the defendant shall file and serve on the plaintiff its final demand for compensation in the proceeding. Such offers and demands shall be the only offers and demands considered by the court in determining the entitlement, if any, to litigation expenses. . . .

"(b) If the court, on motion of the defendant made within 30 days after entry of judgment, finds that the offer of the plaintiff was unreasonable and that the demand of the defendant was reasonable viewed in the light of the evidence admitted and the compensation awarded in the proceeding, the costs allowed . . . shall include the defendant's litigation expenses. . . ."

All further statutory references are to the Code of Civil Procedure, unless otherwise noted.

BACKGROUND

For more than 40 years the Yuki family[2] has owned numerous parcels of property in the vicinity of Lark Avenue in the Town of Los Gatos. The property which is the subject of this action consisted of approximately 45 acres, bisected by Highway 17. Approximately 34 acres lay on the east side of Highway 17 with an additional 11 acres on the west side. These 2 parts of the property were connected by a concrete-reinforced tunnel 10 feet high and 14 feet wide passing beneath the highway. The tunnel, called the "Yuki Underpass," was constructed when the highway was first built in the late 1950's so that the Yuki family could continue to have access from one side of their lands to the other.

In 1991, the State designated approximately 5.6 acres of the Yukis' property on the east side of Highway 17 for use in a project which involved widening Highway 17, improving the Lark Avenue interchange and constructing the Highway 17/85 interchange. The project would result in the destruction of the Yuki Underpass.

In March of 1991, the State appraised the property to be taken at $4,723,503. On April 15, 1991, pursuant to a possession and use agreement, the Yukis granted the Santa Clara Traffic Authority the immediate right to possess and use the property in exchange for payment of $4,723,503. The agreement provided that if a judgment were later awarded in excess of that amount, the traffic authority would pay the Yukis the difference, plus interest from April 15, 1991. It further provided that if judgment were later rendered in an amount less than the $4,723,503, the Yukis would be obligated to refund the difference.

The State filed its complaint in eminent domain on December 19, 1991, asking that the court determine just compensation as of that date, condemn the property and give title to the State. The case was set for a jury trial to commence October 26, 1992.

On September 16, 1992, the Yukis and the State exchanged lists of expert witnesses and statements of valuation data. These documents disclosed each party's experts and contained reports by the parties' appraisers setting forth their opinions of the value of the property. The Yukis submitted two appraisals. One appraiser, Floyd Clevenger, valued the subject property at $6,493,450, plus $977,900 for severance damages to the remaining lands, a total of $7,471,350. The other, Desmond Johnson, valued the property at

---

[2]We will refer to defendants Miyoko Yuki, Thomas Yuki, Emiko Yamate, Peni Chieko Morimoto and Herbert T. Yuki collectively as "the Yukis."

$6,350,000 plus $852,000 in severance damages, a total of $7,202,000. Neither appraiser included any amount for "special benefits."[3]

The State's appraiser, Norman Hulberg, valued the property at $4,048,981, some $700,000 less than his original appraisal. According to the State, this discrepancy reflected declining values in the area between the time of the first appraisal in March of 1991 and the date of valuation, December 19, 1991. Hulberg included $0 for severance damages and claimed $3,743,388 for "special benefits."

Severance damages represent the injury, if any, caused to the remaining property by the severance of the part acquired by the government agency and the construction and use of the project. (§ 1263.420.) Section 1263.410, subdivision (a), provides that severance damages are awardable, in addition to the fair market value compensation, "[w]here the property acquired is part of a larger parcel." Determination of severance damages thus involves a comparison of the value of the "larger parcel" both before and after the State's project.

The two appraisers retained by the Yukis considered the entire 45 acres of property on both the east and west sides of Highway 17 to be the "larger parcel" for purposes of severance damages. Although the State's initial appraisal, prepared in March of 1991, had likewise considered the entire 45 acres to be the "larger parcel," at the time of the exchange of valuation information the State had concluded that the "larger parcel" did not include the western portion of the Yuki lands for the reason that the Yuki Underpass did not provide a sufficient "ownership link" between the two sides of the property. Therefore, the September 16, 1992, appraisal confined itself to an evaluation of the effect of the project only on the eastern portion of the Yukis' property and found no severance damages.

As to special benefits, the State appraiser determined that the remaining property would benefit substantially from the widening of Los Gatos Boulevard and Lark Avenue. The Yukis' appraisers did not include special benefits for the reason that the widening of those streets was to be accomplished independently by the Town of Los Gatos rather than by the State as part of the project.

The parties exchanged their final offer and final demand, pursuant to section 1250.410, subdivision (a), on September 25, 1992. The Yukis demanded $5,975,000 for the property taken plus $550,000 for severance

---

[3]Section 1263.430 defines this term as the "benefit, if any, caused by the construction and use of the project for which the property is taken . . . ." By law, benefits are deducted from severance damages, but not from compensation required to be awarded for the property taken. (§ 1263.410, subd. (b).)

damages to the remainder, a total of $6,525,000. The State offered $5 million. The parties were unable to reach any agreement at the ensuing settlement conference and the case went to trial as scheduled on October 26, 1992.

A pretrial motion sought a ruling as to what was to be considered the "larger parcel" within the meaning of section 1263.410, subdivision (a). The matter was briefed and argued and the court ruled that for purposes of compensation in this action, the "larger parcel" consisted of the entire 45 acres on both sides of the highway, connected by the Yuki Underpass.

At the end of the jury trial, which spanned several weeks, the jury rendered a verdict awarding the Yukis a total of $6,469,840, comprised of $6,146,690 representing the fair market value of the property taken, plus $323,150 for severance damages, and $0 in special benefits. The State was credited with the $4,723,503 paid to the Yukis on April 15, 1991, leaving a balance of $1,746,337. Judgment was entered on January 28, 1993, awarding that amount to the Yukis, plus interest from April 15, 1991, which amounted to $223,739.60. On January 29, 1993, the Yukis acknowledged receipt of the total amount of $1,970,076.60, in satisfaction of the judgment.

From this sum the Yukis reimbursed themselves $163,636.95 for amounts expended on the appraisals, engineering reports and other expenses of litigation. Their net recovery was therefore $1,806,439.65. Pursuant to a contingency fee agreement with their attorneys, Turner & Mulcare, a Professional Corporation, the Yuki family paid 40 percent of this net recovery amount, a total of $722,575.86, to Turner & Mulcare for attorney fees.

On February 11, 1993, the Yukis filed their motion to recover litigation expenses, pursuant to section 1250.410, subdivision (b),[4] on the basis that the State's final offer had been unreasonable, thus requiring unnecessary litigation. In a memorandum of costs submitted with the motion, the Yukis claimed "Litigation Expenses" in the total amount of $1,452,846.25. This sum included reimbursement for the two appraisals paid for by the Yukis, at $42,941.30 and $41,055.00 respectively, engineering fees of $57,481.37, miscellaneous costs and expenses of $7,654.37 and attorney fees of $1,303,714.30, which were calculated based on a formula derived from the 40 percent contingency fee agreement.

Following a hearing on the motion, the court issued a written order, dated May 21, 1993, in which it found that the State's final offer was unreasonable and that the Yukis' final demand was reasonable. The court awarded the Yukis total litigation expenses of $1,452,846.25, the exact amount requested.

---

[4]See footnote 1, *ante.*

The State appeals from that order, challenging both the entitlement to litigation expenses and the amount of the award.

ANALYSIS

*The Reasonableness Determination*

■ The purpose of section 1250.410 is to encourage settlement of condemnation actions by providing incentives to a party who submits a reasonable settlement offer or demand before trial. (*Santa Clara Valley Water Dist.* v. *Gross* (1988) 200 Cal.App.3d 1363, 1368 [246 Cal.Rptr. 580]; *People* ex rel. *Dept. of Transportation* v. *Callahan Brothers* (1977) 69 Cal.App.3d 541, 544 [138 Cal.Rptr. 239].) "A property owner who files a reasonable demand, but is required nonetheless to litigate because of the public agency's unreasonable position, can be fully compensated for his [or her] litigation expenses. Conversely, a condemnor who makes a timely reasonable offer may avoid having to pay the property owner's expenses except for taxable costs." (*Santa Clara Valley Water Dist.* v. *Gross, supra,* at p. 1368.)

At the hearing on a section 1250.410 motion, the court determines the reasonableness of the offer and demand "in the light of the evidence admitted and the compensation awarded in the proceeding . . . ." (§ 1250.410, subd. (b).) The question of reasonableness is addressed to the court's discretion, to be exercised "after weighing all the evidence and assessing witness credibility independently of the jury." (*County of San Diego* v. *Woodward* (1986) 186 Cal.App.3d 82, 90 [230 Cal.Rptr. 406].) ■ "The trial court's determination of that issue is a resolution of a question of fact and will not be disturbed on appeal if supported by substantial evidence." (*Redevelopment Agency* v. *Gilmore* (1985) 38 Cal.3d 790, 808 [214 Cal.Rptr. 904, 700 P.2d 794].)

■ One factor to be considered in determining the reasonableness of an offer or demand is the proportion it bears to the subsequent award to defendant. (§ 1250.410, subd. (b); *Redevelopment Agency* v. *Gilmore, supra,* 38 Cal.3d at p. 808; *City of El Monte* v. *Ramirez* (1982) 128 Cal.App.3d 1005, 1012 [180 Cal.Rptr. 690].) In addition, case law has developed several other factors bearing on the question of reasonableness: ". . . the proportional difference between offer and demand, the absolute monetary amounts, and the good faith, care, and accuracy in the method of determination of offer and demand." (*County of Los Angeles* v. *Kranz* (1977) 65 Cal.App.3d 656, 659 [135 Cal.Rptr. 473]; cf. *Glendale Redevelopment Agency* v. *Parks* (1993) 18 Cal.App.4th 1409, 1415-1416 [23 Cal.Rptr.2d 14]; *San Diego Gas*

*& Electric Co.* v. *Daley* (1988) 205 Cal.App.3d 1334, 1352 [253 Cal.Rptr. 144]; *County of San Diego* v. *Woodward, supra,* 186 Cal.App.3d at p. 90.)

The Yukis' final demand was less than 1 percent over the jury's award and is not in question here. The State's final offer of $5 million was 77.28 percent of the jury's verdict of $6,469,840. A survey of cases indicates that final offers which are 60 percent or less of the jury's verdict are found to be unreasonable while offers which are above 85 percent have been considered reasonable per se.[5] Those in the middle range, as in this case, can fall within either group, depending upon the other factors, particularly whether the government agency was unyielding and the extent of the "good faith, care, and accuracy in the method of determination of offer and demand." (*County of Los Angeles* v. *Kranz, supra,* 65 Cal.App.3d at p. 659; *City of El Monte* v. *Ramirez, supra,* 128 Cal.App.3d at p. 1012.)

Thus in *County of Los Angeles* v. *Kranz, supra,* 65 Cal.App.3d 656, the county's offer, which was 79 percent of the ultimate award, was found to be unreasonable "as a matter of law." Not only was it "significantly disproportionate to the adjudicated value of the property," but the county had "stubbornly stuck to its own appraisal plus a small amount which would barely cover landowners' added costs of preparing the cause for trial." (*Id.* at p. 660.) Likewise, in *Community Redevelopment Agency* v. *Krause* (1984) 162 Cal.App.3d 860 [209 Cal.Rptr. 1], the government's offer of 82 percent of the jury award was determined to be unreasonable where the government refused to offer anything above its appraised value of the property, and where the appraiser used noncomparable properties as the basis for his opinion of value. (*Id.* at pp. 864, 866.) On the other hand, in *State of California* ex rel. *State Pub. Works Bd.* v. *Turner* (1979) 90 Cal.App.3d 33 [153 Cal.Rptr. 156], the State's offer in the amount of 78 percent of the verdict was determined to be reasonable where the State retained a qualified appraiser, who used proper comparables to determine the value of the property, and there was no evidence he or the State's attorney attempted to keep the values low or otherwise act in bad faith. Indeed, in *Turner,* although the State was unyielding in its position, its determination of value was based upon an honest, though mistaken, belief in the correctness of its analysis.

 The State argues here that consideration of these factors leads to the conclusion that the State did not act unreasonably in determining its final

---

[5]*City of Commerce* v. *National Starch & Chemical Corp.* (1981) 118 Cal.App.3d 1, 20 [173 Cal.Rptr. 176] (32 percent held to be unreasonable under former § 1249.3); *Redevelopment Agency* v. *First Christian Church* (1983) 140 Cal.App.3d 690, 707 [189 Cal.Rptr. 749] (41 percent was unreasonable); *City of Gardena* v. *Camp* (1977) 70 Cal.App.3d 252, 257 [138 Cal.Rptr. 656] (52 percent unreasonable under former § 1249.3); *Los Angeles Unified Sch. Dist.* v. *C.F. Bolster Co.* (1978) 81 Cal.App.3d 906, 916 [146 Cal.Rptr. 789] (87 percent per se reasonable); *City of Los Angeles* v. *Cannon* (1976) 57 Cal.App.3d 559, 562 [127 Cal.Rptr. 709] (91 percent held reasonable).

offer. The State points out that its final offer represented a substantial movement towards the Yukis' appraisals. When the parties exchanged lists of experts and valuation data, the State appraiser's estimate of value was $4,048,981 while the two appraisers for the Yukis valued the property at $7,471,350 and $7,202,000. The State's final offer of $5 million represented an increase of $1 million, nearly 25 percent of its appraised value. In contrast, State argues, the Yukis' final demand of $6,525,000, represented only a 12 percent reduction from the average of their two appraisals.

The State argues further that in addition to showing flexibility in making its final offer, it used good faith, care and accuracy in its method of determination of the final offer. The State's appraiser Hulberg, a qualified M.A.I. (member, Appraisal Institute) appraiser with long-standing experience, used the comparable data approach, a recognized valuation method based on recent sales of similar property in the area. He determined the highest and best use of the property was for mixed commercial and residential development and then proceeded to compare sales on 16 similarly situated properties to arrive at an estimate of fair market value.

Although Hulberg failed to include any value for severance damages in his appraisal, the State argues that this did not reflect a lack of good faith or accuracy but rather was based upon a conclusion by the State's lawyers that the property owned by the Yukis on the west side of Highway 17 was not legally a part of the "larger parcel" to be considered in evaluating just compensation. The determination regarding "special benefits," the State argues, was similarly made in good faith.

In reviewing this matter our task is not to determine whether the State's offer was reasonable. That was the task of the trial court. On appeal the trial court's decision must be upheld if supported by substantial evidence. (*Redevelopment Agency* v. *Gilmore, supra,* 38 Cal.3d at p. 808.) "The measure of reasonableness is in the first instance a factual matter for the trial court," unless "the uncontradicted evidence permits only one conclusion . . . ." (*County of Los Angeles* v. *Kranz, supra,* 65 Cal.App.3d at p. 659.) We do not agree with the State that this is a case where only one conclusion was possible. On the contrary we believe the record on the whole supports the trial court's discretionary determination that the State's final offer was unreasonable.

Although the final offer of $5 million represented an increase from the State's appraisal of $4,048,981, it was nonetheless still approximately 23

percent lower than the final demand and the eventual judgment.[6] On the basis of the "absolute monetary amounts" (*County of Los Angeles* v. *Kranz, supra,* 65 Cal.App.3d at p. 659), the cases suggest that such an offer is unreasonable, unless, in the trial court's assessment, the State has proceeded with sufficient "good faith, care, and accuracy" as to justify its low offer. (*Ibid.*) Having presided over the lengthy trial proceedings, the trial court was in the best position to evaluate these factors based on the evidence presented.

In formulating the final offer, State necessarily relied on the appraisal prepared by Hulberg. His appraisal contained three elements: the value of the land acquired, severance damages, and special benefits. Evidence at trial supported a conclusion that Hulberg's valuation of the acquired land was inaccurate, and indeed the jury found the property itself was worth over $2 million more than the State's appraisal showed ($6,146,690 as opposed to $4,048,981). Hulberg's testimony revealed that he was uninformed about certain aspects of the property, such as the nature of the improvements and the existence of a sewer line and storm drainage. At trial he changed his opinion about severance damages after hearing testimony by the Yukis' engineer, and he eventually allowed for severance damages of $203,000. His estimate of value was based upon several low-density residential sales, although the Yukis' property was medium density, and several commercial properties were used, which were admittedly inferior to the subject property.

In regard to severance damages, the State's appraisal included $0 severance damages. While that assessment turned on an interpretation of the statutory meaning of "larger parcel" and the legal effect of the Yuki Underpass, counsel conceded at the section 1250.410 motion that these issues were not complex. *People* ex rel. *Dept. Pub. Wks.* v. *DiTomaso* (1967) 248 Cal.App.2d 741, 746 [57 Cal.Rptr. 293], upon which the Yukis relied to support their position on this issue, considered language almost identical to that describing the Yukis' rights in the "Yuki Underpass" connecting the two sides of their property. The State's trial brief on this issue did not discuss the *DiTomaso* case. Moreover, two out of three appraisals of this property included the western portion of the Yukis' lands in the evaluation of just compensation. Hulberg's decision to evaluate only the eastern portion was based on legal advice which conflicted not only with the opinions of defendants' experts but also with the State's own prior opinion on the

---

[6]Although the court was aware that the State had already paid the Yukis $4,723,503, and thus its offer of $5 million was a relatively modest increase, it appears that any offers or deposits, other than the final offer and demand, are not to be considered at the section 1250.410 motion. (§ 1250.410, subd. (a).) The court had ruled that the March 1991 appraisal was not admissible at trial on the issue of compensation or to impeach a witness, pursuant to section 1255.060. Section 1250.410, subdivision (b) provides that the determination of reasonableness is to be made "in the light of the evidence *admitted* . . . in the proceeding."

matter. The trial court could have concluded that a reasonable condemnor under these circumstances would give weight to the opinion of other qualified experts, acknowledge the position of the other side and recognize the possible consequences of an adverse decision at trial. (*County of Los Angeles v. Kranz, supra,* 65 Cal.App.3d at p. 660; *San Diego Gas & Elec. Co. v. Daley, supra,* 205 Cal.App.3d at p. 1352; *Los Angeles County Flood Control Dist.* v. *Mindlin* (1980) 106 Cal.App.3d 698 [165 Cal.Rptr. 233]; *City of Gardena* v. *Camp, supra,* 70 Cal.App.3d at p. 257.)

Similarly, the State's appraisal included a substantial amount ($3,743,388) for "special benefits" to the remaining property from the construction and use of the project. The benefits claimed, however, assertedly resulted from the widening of Los Gatos Boulevard and Lark Avenue, projects of the Town of Los Gatos, rather than the State. For that reason, and in reliance on the case of *United Cal. Bank* v. *People* ex rel. *Dept. Pub. Wks.* (1969) 1 Cal.App.3d 1 [81 Cal.Rptr. 405], which was directly on point, the Yukis maintained that no value should be assigned for any special benefits. The State's claim of special benefits was rejected at trial. The jury found no special benefits.

In sum, the State's final offer was substantially lower than the jury's verdict and was based on an unwavering reliance on an appraisal which was over $2 million low in its valuation of the acquired land and incorrect in its evaluation of both severance damages and special benefits, issues which, although arguable, were concededly not complex. Under the circumstances, the trial judge was well within the scope of his discretion in determining such an offer to be unreasonable.

*Attorney Fees*

Section 1235.140 provides that the litigation expenses a property owner may recover from the condemning agency pursuant to section 1250.410 include: "Reasonable attorney's fees, appraisal fees, and fees for the services of other experts where such fees were reasonably and necessarily incurred to protect the defendant's interests in the proceeding . . . ." (§ 1235.140, subd. (b).) ■ While the amount to be awarded as attorney fees is a matter committed to the court's discretion (*Glendora Community Redevelopment Agency* v. *Demeter* (1984) 155 Cal.App.3d 465, 474 [202 Cal.Rptr. 389]), courts have developed general rules to guide the exercise of that discretion in determining a reasonable fee. (*Ibid.*) Moreover, the court is limited by the dictates of the statute authorizing the fee. Where it can be shown that the fee was not "reasonably and necessarily incurred to protect defendant's interests

in the proceeding," it follows that the requirements of the statute are not met and the award must be reversed.

The attorney fee awarded in this case, $1,303,714.30, was based on the parties' contingency fee agreement, which provided for a fee of 40 percent of all "compensation" received by the clients, and defined "compensation" to "include[] any and all litigation expenses which are reimbursed to Clients." In accordance with this agreement, the request for attorney fees set forth the following calculation. The Yukis' net recovery after trial was $1,806,439.65. To this figure was added $149,131.95, representing the following amounts paid by the Yukis for litigation expenses: $42,941.30 to appraiser Clevenger, $41,055.00 to appraiser Johnson, $57,481.37 to the engineer, and $7,654.28 to the attorneys, Turner & Mulcare, for miscellaneous costs and expenses advanced by them. The resulting figure, $1,955,571.50, was termed " 'Net Compensation' Before Inclusion of Anticipated Attorneys' Fees Recovery." At this step of the calculus, there was added a figure for attorney fees in an amount equal to 40 percent of the sum of the "Net Compensation" before attorney fees plus attorney fees. This figure was $1,303,714.30.[7] When the $1,303,714.30 representing attorney fees was added to the other litigation expenses, in the amount of $149,131.95, the total amount of litigation expenses was $1,452,846.25. That was the exact amount requested by the Yukis and awarded by the court.

It is apparent from these calculations that the total attorney fee awarded ($1,303,714.30) included not only 40 percent of the net recovery after trial, which the Yukis had already paid to their attorneys ($722,575.86), but also a figure representing 40 percent of expenses of litigation and anticipated attorney fees ($581,138.44). Therefore the total amount of attorney fees awarded ($1,303,714.30) actually represented 72 percent[8] of the Yukis' net recovery ($1,806,439.65), rather than 40 percent.

 The State argues that the attorney fees awarded were not "reasonably and necessarily incurred" both because the award was derived from the contingency fee agreement and also because it included an improper "surcharge" of $581,138.44. We agree that the surcharge was improper and we

[7]We have constructed the following formula to represent this calculation, where "a" equals attorney fees:

$a = 40$ percent $(a + \$1,955,571.50)$

$a = .4a + .4 \times \$1,955,571.50$

$a - .4a = .4 \times \$1,955,571.50$

$.6a = \$782,228.60$

$a = \$782,228.60 \div .6$

$a = \$1,303,714.30$

[8]The State uses a figure of 67 percent here, basing its percentage on the judgment paid by the State ($1,970,076.60) rather than on the Yukis' net recovery ($1,806,439.65).

will reverse on that basis. However, to put this issue in perspective, we will first briefly review prevailing law regarding the reasonableness of attorney fee awards based on contingency fee agreements.

The case of *Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914 [218 Cal.Rptr. 839], provides a comprehensive discussion of this area of law. The court in *Salton Bay* observed initially that California decisions have not been consistent. Some courts have awarded fees on the basis of a contingency fee agreement. (*Lake County Sanitation Dist.* v. *Schultz* (1978) 85 Cal.App.3d 658, 663, 674 [149 Cal.Rptr. 717]; *Parker* v. *City of Los Angeles* (1974) 44 Cal.App.3d 556, 567 [118 Cal.Rptr. 687].) Others have ignored the contingent fee agreement. (*County of Madera* v. *Forrester* (1981) 115 Cal.App.3d 57, 65 [170 Cal.Rptr. 896].) Still others have considered a contingent fee agreement as a starting place for determining a reasonable fee (*Glendora Community Redevelopment Agency* v. *Demeter, supra,* 155 Cal.App.3d at pp. 470, 477-478), or have awarded fees based upon a consideration of time spent and other factors, including the contingency nature of the fee agreement. (*La Mesa-Spring Valley School Dist.* v. *Otsuka* (1962) 57 Cal.2d 309, 316 [19 Cal.Rptr. 479, 369 P.2d 7]; *Redevelopment Agency* v. *First Christian Church, supra,* 140 Cal.App.3d at p. 707; *City of Oakland* v. *Oakland Raiders* (1988) 203 Cal.App.3d 78 [249 Cal.Rptr. 606].)

The court discerned a trend both in this state and in other jurisdictions "to regard the existence of a contingent fee contract as either irrelevant or as but one factor to be considered by the court when it determines what is a reasonable attorney fee." (*Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist., supra,* 172 Cal.App.3d at pp. 953-954, and cases collected there, fn. omitted.) Sound policy supports such a practice: " '[F]avorable public perception and the prestige of the legal profession and our system of justice, requires a formula for computation [of an attorney's fee] which can be objectively measured.' " (*Ibid.,* quoting *Jutkowitz* v. *Bourns, Inc.* (1981) 118 Cal.App.3d 102, 111 [173 Cal.Rptr. 248].) " '[T]he correct amount of compensation cannot be arrived at objectively by simply taking a percentage [of the recovery].' " (172 Cal.App.3d at p. 954.) These considerations are particularly apt, the court observed, in condemnation cases where the taxpayers ultimately pay the bill.

Although *Salton Bay* concerned an inverse condemnation case and thus considered the statutory language of section 1036,[9] the following comments are equally applicable to section 1235.140: "By stating fees must be both

[9]That section provides for the recovery of "reasonable attorney, appraisal and engineering fees, actually incurred because of such proceeding."

reasonable and 'actually incurred', the Legislature intended to protect the public from both unreasonable fee awards as well as from fee awards that bear no relationship to the amount of attorney time actually incurred in the preparation and trial of the case." (*Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist., supra,* 172 Cal.App.3d at p. 954.)

The court disapproved of a decision published the previous year, *Glendora Community Redevelopment Agency* v. *Demeter, supra,* 155 Cal.App.3d 465, where an award based on a contingency agreement had been upheld even though the fee represented more than 12 times the usual hourly rates of attorneys specializing in condemnation. "The fallacy of the reasoning in *Glendora*," the court pointed out, "is that it views the reasonableness of the fees from the client's perspective, i.e., whether the client was reasonable in agreeing to share a specified percentage of his recovery with his attorney. However, in *Glendora*, as in the instant case, the fee award is not paid by the client but by the public entity. This is a crucial distinction. [¶] When the award is paid by the client, the inquiry must focus on any agreement the client bargained for and agreed to. Necessarily, the reasonableness of the agreed upon fees must be viewed in light of the reasonable expectation of the client and the circumstances which existed at the time he [or she] executed the agreement. In contrast, when the award is paid by the public entity, the bargaining in reaching a contingency fee agreement is of doubtful value since the bargaining was done by the client and his [or her] attorney rather than by the public entity and the bargaining is less likely to be a guarantee of reasonableness. If the public entity is bound to the contingent fee agreement, then the client lacks incentive to keep the attorney's share reasonable since the attorney's share will neither come out of the client's recovery nor be paid by the client." (*Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist., supra,* 172 Cal.App.3d at p. 957.)

In *Salton Bay*, plaintiffs had claimed attorney fees in excess of $4 million, based on a 40 percent contingency fee agreement. There was evidence that a reasonable fee based on average hourly rates would have been around $750,000. The trial court had determined a fee of $2,984,000, by using its own variation of the 40 percent formula. On appeal, the court rejected this approach, holding that an attorney fee award which the Legislature has determined must be reasonable may not be based solely on a percentage of recovery pursuant to a contingency fee agreement. The court reversed the award and remanded for a redetermination of attorney fees, to be based on the amount of time spent on the case and other factors. (*Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist., supra,* 172 Cal.App.3d at p. 957.)

We believe the holding in *Salton Bay* correctly reflects the state of the law. A trial court may not determine a "reasonable" attorney fee *solely* by

reference to the amount due under a contingency agreement. (*Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist., supra*, 172 Cal.App.3d at p. 957; *Aetna Life & Casualty Co.* v. *City of Los Angeles* (1985) 170 Cal.App.3d 865, 881 [216 Cal.Rptr. 831].) However, the court may consider the contingent nature of the fee agreement as one factor in determining a reasonable fee. Other factors to be considered by the court, where appropriate, include: the novelty and difficulty of the questions involved and the skill required to perform the legal services properly; the likelihood that the acceptance of this particular employment would preclude other employment by the attorneys; the amount involved and the results obtained; the time limitations imposed by the clients or by the circumstances of the case; the nature and length of the professional relationship with the client; the experience, reputation, and ability of the attorneys who performed the services; the time and labor required of the attorneys; and the informed consent of the client to the fee agreement. (*Glendora Community Redevelopment Agency* v. *Demeter, supra*, 155 Cal.App.3d at p. 474; Cal. Rules Prof. Conduct, former rule 2-107.)

 The Yukis acknowledge that the fee award here is exactly the amount claimed pursuant to the parties' contingency fee agreement, but argue that it is nonetheless justified because the trial court's order stated that the court considered all of the factors listed above. (*Glendora Community Redevelopment Agency* v. *Demeter, supra*, 155 Cal.App.3d at pp. 472-473.) In the *Glendora* case, the court held that the trial court, in the exercise of its discretion, "should consider the terms of an attorney fee agreement, and may even award attorney fees in the same amount as would be called for by those terms, [but it] may not do so without considering whether an award in the amount set by the agreement is reasonable in the context of all of the factors which we have set forth." (*Id.* at p. 473.) The State, on the other hand, contends that it is improper for the trial court to start with the amount of the contingency fee and then work backwards, applying the various other factors in order to justify that amount. " 'The starting point of every fee award,' " the State argues, " 'must be a calculation of the attorney's services in terms of the time he [or she] has expended on the case.' " (*Serrano* v. *Priest* (1977) 20 Cal.3d 25, 48, fn. 23 [141 Cal.Rptr. 315, 569 P.2d 1303]; *Aetna Life & Casualty Co.* v. *City of Los Angeles, supra*, 170 Cal.App.3d at p. 881.) Therefore, the State maintains, an order awarding attorney fees is reversible unless it reflects that the court determined the fee by starting with the time the attorney expended.

We need not resolve this question of methodology here[10] because in this case a substantial surcharge of $581,138.44 was figured into the award. The

---

[10]In an order dated September 1, 1994, we declined the parties' request to submit further briefing on the lodestar method of calculating attorney fees.

surcharge was not only improper, as we discuss below, because it was not reasonably related to the services performed, but it also resulted in a fee which was over 70 percent of the net amount recovered by defendants at trial. Our Supreme Court has observed that an attorney fee award of this proportion would be "grossly excessive" and "unconscionable." (*Jackson* v. *Campbell* (1932) 215 Cal. 103, 106 [8 P.2d 845].)

We turn now to the issue of the surcharge. *Aetna Life & Casualty Co.* v. *City of Los Angeles, supra,* 170 Cal.App.3d 865, is directly on point and we will adopt its holding.[11] In *Aetna* the court found that the same method of compounding fees and costs as was used here resulted in an improper surcharge on expenses and attorney fees. The court in *Aetna* described the attorney fee award in that case as follows: "The award of attorney fees was based largely upon the contingent fee agreement between plaintiffs and their counsel, which required plaintiffs to pay their attorneys 20 percent of 'any and all sums actually recovered.' Plaintiffs offered the novel theory that they will be obligated by this agreement to pay to their attorneys 20 percent of the gross amount awarded to them, which will include compensation for the damages suffered . . . and all costs of the suit, including court costs, expert witness fees *and attorney fees already figured as 20 percent of the award.* They contend that because these are all costs 'actually incurred' by them they are entitled to full reimbursement from defendants under section 1036. The result, of course, is a compounding of the costs charged to defendants as reimbursement for plaintiffs' costs and attorney fees." (*Aetna Life & Casualty Co.* v. *City of Los Angeles, supra,* 170 Cal.App.3d at p. 880, italics in original.)

The constitutional requirement of just compensation, the court continued, "cannot be interpreted as giving the property owner carte blanche authority to 'run up the bill.' " (*Aetna Life & Casualty Co.* v. *City of Los Angeles, supra,* 170 Cal.App.3d at p. 880.) Costs and attorney fees awarded as part of just compensation must "necessarily be limited to what was 'reasonable.' " (*Ibid.*) The starting point in determining a reasonable fee is " 'a calculation of the attorney's services in terms of the time he [or she] has expended on the case.' " (*Serrano* v. *Priest, supra,* 20 Cal.3d at p. 48, fn. 23.) "Anchoring

---

[11]The *Aetna* case, like the *Salton Bay Marina* case, involved inverse condemnation and the proceeding was therefore governed by section 1036. As we have noted, we do not find any meaningful difference between the language of section 1036, which provides for recovery of reasonable costs and expenses "including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding," and the language of section 1235.140, which provides for "[r]easonable attorney's fees, appraisal fees, and fees for the services of other experts where such fees were reasonably and necessarily incurred to protect the defendant's interests in the proceeding . . . ." (See *Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist., supra,* 172 Cal.App.3d at pp. 954-955.)

the analysis of reasonableness to this concept is the only approach that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts." (*Aetna Life & Casualty Co.* v. *City of Los Angeles, supra,* 170 Cal.App.3d at p. 881.)

The court in *Aetna* found that the attorney fee award in that case did not comport with these standards of reasonableness in two respects. First, the award represented the fee due under the parties' contingency agreement, with no consideration of the actual number of hours worked by the attorneys or what relationship the fee award bore to the hours worked. That, the court found, was error. (*Aetna Life & Casualty Co.* v. *City of Los Angeles, supra,* 170 Cal.App.3d at p. 881.) Second, the court found that the method used to compound the fee was "improper." (*Ibid.*) "In effect it amounts to a surcharge of 20 percent by plaintiffs' attorneys upon all elements of the gross award, which, as we have noted, already contained an award of attorney fees. We do not believe that the Legislature ever intended that section 1036 be used this way. Tacking a 20 percent surcharge onto the court costs, expert witness fees and attorney fees presents a bonus payment to plaintiffs' attorneys. . . . [T]he award of attorney fees as compounded by the trial court was excessive and improper." (*Aetna Life & Casualty Co.* v. *City of Los Angeles,* 170 Cal.App.3d at pp. 881-882.)

The Yukis make several arguments to distinguish *Aetna*. First, they characterize the court's discussion of the improper compounding of fees upon fees as dicta, for the reason that the court had already decided to reverse the fee award on another basis. ■ An alternative ground for a holding, however, is not dictum. (*Greyhound Lines, Inc.* v. *County of Santa Clara* (1986) 187 Cal.App.3d 480, 485 [231 Cal.Rptr. 702].) Instead, dictum consists of general observations of law which go beyond the facts and issues of the case. (*Achen* v. *Pepsi-Cola Bottling Co.* (1951) 105 Cal.App.2d 113, 124-125 [233 P.2d 74]; *Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524 [39 Cal.Rptr. 377, 393 P.2d 689].) In its discussion of the surcharge, the court in *Aetna* was not making general observations about attorney fees. Rather it was stating its conclusion about the facts before it, finding squarely that "the method used to compound the fee was improper." And it made clear that this was "[i]n addition to" its conclusion in the previous discussion that the trial court's failure to consider the attorney's hourly rates was error. (*Aetna Life & Casualty Co.* v. *City of Los Angeles, supra,* 170 Cal.App.3d at p. 881.)

■ The Yukis attempt to distinguish *Aetna* on its facts, pointing out that in *Aetna* the fee agreements in question were entered into before the theory of inverse condemnation was introduced into the case, and thus the collection of fees and costs pursuant to section 1036 may not have been

within the contemplation of the parties. We do not see how this makes a difference and indeed the court in *Aetna* clearly implied that regardless of the time when the parties made their agreement and what they did or did not contemplate at that time, ". . . the award of attorney fees as compounded by the trial court was excessive and improper." (*Aetna Life & Casualty Co.* v. *City of Los Angeles, supra,* 170 Cal.App.3d at p. 882.)

The further argument is made that *Aetna* is distinguishable because in *Aetna* the trial court awarded the amount of the contingency fee without allowing evidence of the attorney's usual hourly rates or considering the relationship the fee award bore to the actual number of hours worked. The Yukis point out that the trial court in our case had before it evidence of the attorneys' average hourly billing rates ($277 per hour) and time sheets reflecting a total of 1,500.3 hours spent on the case through trial. Furthermore, it is argued, the trial court in this case did not simply award the amount of the contingency fee but rather considered all of the other factors, including the relationship of the fee to the actual hours worked.[12]

While this may distinguish our case from *Aetna* on the one basis for *Aetna*'s holding, it is not a distinction which affects the other ground for reversal in *Aetna*, that the compounding of fees was improper. Fees generated by compounding fees and costs bear no relationship to the work done by the attorneys and thus cannot be, in the language of the statute, "reasonably and necessarily incurred to protect the defendant's interests in the proceeding." (§ 1235.140.) Therefore those fees cannot be justified by reference to the various other factors to be considered in determining a reasonable fee.

The Yukis assert that a 40 percent contingency fee agreement is common and accepted in condemnation practice and that a fee which represents over three times the attorney's hourly rate is not unusual. These assertions are supported by the declaration of the Yukis' own attorney, who stated that in his opinion the fee was "fair and reasonable," and by reference to the fee agreement itself. The fact that the attorney and client have agreed on some method of calculating a fee, however, does not make the fee reasonable for purposes of just compensation by the government agency. (*Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist., supra,* 172 Cal.App.3d at p. 957.) If that were so, the property owner would have "carte blanche authority to 'run up the bill.' " (*Aetna Life & Casualty Co.* v. *City of Los Angeles, supra,* at p. 880.) Nor are we persuaded by the argument that the Yukis have "incurred" these fees and will be liable to pay them. The Yukis have already paid 40 percent of the net amount recovered at trial. Any additional fee will necessarily be tied to the court's award in this proceeding. As the court observed

---

[12]An award of $1,303,714.30 for 1,500.3 hours of work amounts to an hourly rate of $870 per hour, 3.14 times the average rate charged by these attorneys.

in *Salton Bay*, such amounts "will neither come out of the client's recovery or be paid by the client." (*Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist.*, *supra*, 172 Cal.App.3d at p. 957.)

The Yukis are unable to direct us to any case which refutes the holding in *Aetna*. None of the cases relied upon discuss, or even mention, a surcharge. In *People* ex rel. *Dept. of Water Resources* v. *Andresen* (1987) 193 Cal.App.3d 1144 [238 Cal.Rptr. 826], the court found reasonable an award of $1.2 million in attorney fees, which represented 25 percent of the client's recovery following a jury trial. The court did not explain how this fee was arrived at, other than mentioning there was a contingency fee agreement. In *Glendora Community Redevelopment* v. *Demeter*, *supra*, 155 Cal.App.3d 465, the court also found a fee of 25 percent of the client's recovery to be reasonable. On remand in *Glendora*, the trial judge had discussed at length each of the various other factors as applied to the particular fee in question. Therefore, the court of appeal found that there was substantial evidence to support the trial court's determination. *City of Oakland* v. *Oakland Raiders*, *supra*, 203 Cal.App.3d 78 did not even involve a contingency fee. In that case a fee award of $2 million was affirmed, based on a calculation which began with the average hourly rate and hours worked and was increased, in the court's discretion, after consideration of the various circumstances of the case. None of these cases provides any basis for concluding that a surcharge is a proper method of calculating a reasonable attorney fee.

■ As a final point, the Yukis argue that an attorney fee award of less than $1,303,714.30 will fail to make them "whole" because a reasonable attorney fee must include fees incurred in securing recovery of attorney fees and other litigation expenses. (*Estate of Trynin* (1989) 49 Cal.3d 868, 874 [264 Cal.Rptr. 93, 782 P.2d 232]; *City of Oakland* v. *Oakland Raiders*, *supra*, 203 Cal.App.3d at p. 85; *Lake County Sanitation Dist.* v. *Schultz*, *supra*, 85 Cal.3d at p. 673; *Serrano* v. *Priest*, *supra*, 32 Cal.3d at p. 624.)

We recognize the rule that ". . . when an amount of attorney's fees is statutorily authorized, the reasonable expenses of preparing the application for fees should be included in the award." (*Bruckman* v. *Parliament Escrow Corp.* (1987) 190 Cal.App.3d 1051, 1062 [235 Cal.Rptr. 813].) However, in this case, the additional amount awarded to the attorneys for securing the recovery of litigation expenses was $581,138.44, which included 40 percent of amounts paid by the clients to appraisers and engineers and for other miscellaneous costs ($59,652.78) and 40 percent of an "anticipated" attorney fee ($521,485.66). This amount bears no reasonable relationship to the time assertedly spent by the attorneys posttrial (150 hours) and would compensate the attorneys at a rate of $3,874 per hour. We find this is unreasonable by

any standard. On remand the court may consider in its attorney fee award an amount representing reasonable attorney fees incurred in preparing and arguing the motion.

*Expert Fees*

■ The State claims that the court's award of nearly $84,000 for appraisal fees was excessive as a matter of law. The two appraisers charged $42,941.30 and $41,055.00, reflecting totals of 232 and 269 hours each. The State contends that the services of the two appraisers were duplicative and that their fees, representing approximately six full forty-hour weeks each, were grossly overstated. A fee of $84,000, the State argues, for two appraisals of the same property based on the same standard valuation method, cannot be considered a "reasonable . . . appraisal fee[]" under the statute. (§ 1235.140.)

In awarding these expenses, the trial court stated it considered the experts to be "highly qualified and well-prepared," a finding which is supported by the record. The court expressly found that the fees for their services "have been reasonably and necessarily incurred." The work performed by the two appraisers was summarized in their testimony and is demonstrated by the extensive trial exhibits they each presented. In sum, the case required that they determine the use and developability of the total 45 acres of the Yukis' property in its "before" condition and the 39 acres remaining after the taking, review construction plans to determine the impact on the property, consult with government officials, investigate facts regarding zoning, work closely with the engineer, assess the value of the parcels taken and determine severance damages and potential special benefits. The attorneys stated in declaration that it was their usual practice in cases involving "complex and difficult issues and substantial amounts of money" to recommend that their client retain "at least two real estate appraisers." The court was entitled to exercise its discretion in awarding expert fees, based on the evidence at trial and in light of the court's "own background, experience and knowledge regarding reasonable and necessary litigation expenses . . . ." We find no abuse of discretion on this record.

## DISPOSITION

We affirm the court's order insofar as it determined that defendants are entitled to reasonable expenses of litigation. As to the award itself, we affirm that portion which awards defendants expert witness fees and other costs and expenses advanced by them. We reverse the award of attorney fees of $1,303,714.30, on the ground that it contains an improper surcharge on fees

and costs. On remand the court is to determine a reasonable attorney fee in accordance with established law and the opinions expressed herein. The parties shall bear their own costs on appeal.

Premo, Acting P. J., and Elia, J., concurred.