Filed 12/18/24  City of Pacifica v. Tong CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CITY OF PACIFICA,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>MILLARD W. TONG et al.,<br><br>　　　　Defendants and Appellants. | A168115, A169714<br><br>(San Mateo County<br>Super. Ct. No. 18CIV05455) |
| CITY OF PACIFICA,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>MILLARD W. TONG et al.,<br><br>　　　　Defendants and Respondents. | A169273 |

In this eminent domain action, the City of Pacifica (City) appeals, arguing that the trial court's valuation of the property at issue violated the project influence rule and must be reversed.  The City also challenges the award of litigation expenses to defendants pursuant to Code of Civil Procedure,[1] section 1250.410.  Defendants cross-appeal, claiming the trial court erred in precluding presentation of valuation evidence based upon the

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise designated.

transfer of residential development rights (TDRs) as the highest and best use for the property. Although we conclude that the trial court erred in relying on some valuation evidence that violated the project influence rule, we find that substantial evidence supports the trial court's determination of fair market value and that its award of litigation expenses was proper. We therefore affirm.

## I.  BACKGROUND

The property which is the subject of these proceedings consists of two parcels (Assessor Parcel Nos. 009-413-010 and 009-413-020) located at 310 and 320 Esplanade Avenue in the City, along with an attached easement for ingress, egress, and parking rights in apartment complexes located across the street (the Property). The Property is owned by Millard W. Tong and Alicia W. Tong, as cotrustees under a declaration of trust dated April 30, 1990 (defendants or the Tongs) and was purchased in 2002 for $6 million. It has a gross land area of approximately 1.7 acres or 74,760 square feet, which includes a flat land area on a bluff overlooking the Pacific Ocean, an area contiguous with the beach, and a 70- to 90-foot-high coastal bluff.

The Property is located within the purview of both the California Coastal Commission (Coastal Commission) and the City. It is zoned R-3 for multifamily residential. The Property has good access and panoramic ocean views. However, it also has a history of bluff failure and erosion.

### A.    *Property History*

The Property included two 20-unit apartment buildings located on the flat area at the top of the bluff which were constructed in 1961. Starting around 1997, the City engaged a firm of consulting engineers and geologists to monitor the Property for wave action, erosion, and hazardous conditions. In 2015 and 2016, the City " 'yellow tagged' " and then " 'red tagged' " both

apartment buildings on the Property, requiring the residents to vacate their units.  By 2016, bluff failure and erosion (due in part to wave action) had undermined the foundations of the apartment buildings, creating hazardous conditions and risks to public safety.

On February 9, 2016, the superior court issued an abatement warrant authorizing the demolition of the apartment building on 320 Esplanade Avenue.  A similar abatement warrant was issued for the apartment building on 310 Esplanade Avenue on December 22, 2016.  Millard Tong had filed a petition for chapter 11 bankruptcy in March 2015 and could not pay for the demolition.[2]  The City therefore demolished both apartment buildings at its own expense—the one at 320 Esplanade in March 2016 and the one at 310 Esplanade in January 2017.  The Property is currently unoccupied and vacant.

## B.    *Eminent Domain Proceedings*

### 1.    **Preliminary Matters**

In October 2017, the City sent the Tongs an offer to acquire the Property in accordance with Government Code section 7267.2 pursuant to a negotiated purchase rather than eminent domain.  The attached valuation statement concluded the Property's highest and best use was land banking or

---

[2] The lienholders in the Tong bankruptcy proceedings refused to pay for the demolition of the apartment buildings through the bankruptcy estate. Under the circumstances, the Tongs applied to abandon the Property from the bankruptcy estate so that the buildings could be demolished by the City. In its orders authorizing the abandonment of the Property in February and December 2016, the bankruptcy court found the Property "both burdensome to the estate and of inconsequential value to the estate . . . particularly taking into account the condition of the Property and unlikelihood of the Property being approved for future beneficial use."  In doing so, the court noted it considered the requests after taking judicial notice of the news coverage at that time with respect to the Property as well as the upcoming rainy season.

speculation and that its fair market value was $76,500.[3]  The proposal included five market sales of other properties for purposes of comparison. Subsequent negotiations did not result in an agreement regarding the fair market value of the Property.

On September 10, 2018, the City adopted a resolution of necessity, authorizing the acquisition of the Property by eminent domain for public purposes.  Specifically, the acquisition was required in order to complete the "310–330 Esplanade Infrastructure Preservation Project" (Project).  The Project was created "to design and, after the California Coastal Commission completes the review required by the California Environmental Quality Act ('CEQA') and approves the consolidated development permit, build a shoreline protection structure on the [Property] that will prevent further coastal erosion and damage to Esplanade Avenue and public infrastructure." Acquisition of the Property was necessary in order to complete the Project. The Coastal Commission would have "sole authority" to approve the final design of the Project.

The City's finding of public necessity was based on the conclusions of its consultants who had been monitoring local bluff conditions since 1997. Based on their research and observations, the consultants found the following:  (1) "The bluff is composed of marine terrace deposits that are poorly to moderately cemented and highly susceptible to erosion from wave attack."  (2) "Beginning in 2015, the bluff experienced extremely rapid

---

[3] The Eminent Domain Law (§ 1230.010 et seq.) defines fair market value as "the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available."  (§ 1263.320, subd. (a).)

eastward retreat as a result of wave-induced and seepage-induced landslides."  (3) "On average, the bluff retreats at a rate of 2.5 feet per year. However, because bluff retreat is episodic, it is not unusual to lose 10 feet or more during a single severe storm season.  For example, in February 2016, the bluff top retreated approximately 7 feet."  (4) "The bluff is critically over-steepened and the bluff face displays large cavities and failures." (5) "Accelerated failure and retreat at the bluff top should be anticipated when the unprotected bluff toe is struck by high winter waves or when seasonal rainfall causes elevated moisture contents within the bluff."  (6) "If the toe is stabilized, the bluff will eventually recline to a 50 to 70 degree inclination over the next few years."

The consultants estimated that—at the recent rate of retreat and if left unprotected—only 15 feet of the bluff top would remain after four years. Under such circumstances, Esplanade Avenue would "likely be undermined and unstable and present a threat to public health and safety.  In addition, underground utilities [would be at] risk [of] significant damage."  Moreover, an earthquake or severe storm would "likely accelerate the rate of retreat at the bluff top, and/or trigger a catastrophic collapse of the bluff face."

Reportedly, the Tongs had previously installed two shore protection devices, both of which were ineffective.  In 2009, approximately 6,000 tons of riprap boulders were placed on the bluff toe.  At the time of the resolution of necessity, less than 1,000 tons remained, the rest having been washed away by wave erosion.  Similarly, in 2011, a wall consisting of reinforced shotcrete was secured with 30- to 50-foot soil nails embedded in the bluff face.  Most of the wall has since fallen off of the bluff.

City staff considered and rejected as inadequate and/or infeasible grading the bluff, sand replenishment to build up the beach, and a process

called rock revetment. The Project would most likely consist of a seawall located at the base of the bluff at the Property. According to staff, the Coastal Commission prefers such a shoreline protection structure "from a coastal resources protection standpoint because it leaves a greater area of beach open for recreational use and may be designed to mimic the color and texture of native bluffs thus reducing visual impacts."

### 2. Eminent Domain Complaint and Pretrial Proceedings

On October 9, 2018, the City filed its complaint in eminent domain, seeking to take the Property for a public purpose—i.e., the Project. Shortly thereafter, the City moved for an order of prejudgment possession, arguing there was an overriding need for it to possess the Property in order to ensure timely completion of the Project which outweighed any hardship to the Tongs. In doing so, it noted that its resolution of necessity conclusively established that it was entitled to take the Property by eminent domain. (See §§ 1240.030, 1245.250, subd. (a).) Pursuant to section 1255.010, the City deposited $76,500 with the California State Treasurer as the amount of probable compensation for the Property on November 28, 2018. After hearing on January 29, 2019, the superior court granted the City's motion for immediate possession.

Millard Tong filed an answer to the eminent domain complaint in propria persona in February 2019, arguing that the Tongs were entitled to just compensation for the Property. The answer acknowledged receipt of the City's offer for a negotiated sale of the Property and related appraisal. It stated that an appraisal suggesting a higher fair market value had been transmitted to the City in January 2018, but had not been accepted.[4] Noting

_____

[4] The valuation in the appraisal was premised on a highest and best use assuming development of the Property with a 36-unit condominium. It

6

that the Tongs had provided oral and written objections to the City's resolution of necessity prior to its adoption, the answer also objected to the taking on numerous grounds, such as the City's failure to comply with CEQA (California Environmental Quality Act; Pub. Resources Code, § 21000 et seq.) and to provide an adequate appraisal of the Property. It sought either dismissal of the eminent domain action or just compensation for the Property, along with litigation expenses.

In July 2020, the court accepted a stipulation of the parties continuing the trial date in this matter to January 19, 2021. The stipulation limited the trial to determination of just compensation, as the City's right to take the Property was not disputed. The stipulation arose out of a disagreement regarding whether the Tong bankruptcy's automatic stay precluded the filing of the eminent domain action. In the end, the bankruptcy court issued an order modifying the automatic stay to allow the proceedings to continue.

### 3. The City's Valuation

The City filed its list of expert witnesses and its valuation data in October 2020. The valuation was based on the original appraisal conducted in September 2017 which, as mentioned above, concluded that the Property had a fair market value of $ 76,500.[5] The Property was appraised as it existed on June 15, 2017. Using aerial measurements, the appraisers

---

assumed a cost of $10 million for construction of a seawall. Subtracting the construction costs (including the seawall) from the retail value of the proposed condominium units led to a fair market value of the Property between $2.7 million and $9.9 million. The parking easement was valued on a standalone basis (i.e., no development on the Property) at approximately $1.1 million.

[5] According to the San Mateo County Tax Assessor's Office, at the time of the appraisal the Property was in tax default in the amount of $173,522.

7

estimated that the level land area on the landward side of the bluff top at that time contained approximately 21,780 square feet.

Based on their investigation, the appraisers concluded that any new development on the Property would require protective armoring, such as a seawall. However, the Pacifica Local Coastal Plan Seismic and Safety Element contains a policy prohibiting projects requiring seawalls as a mitigation measure. The appraisers also referenced a 2003 Coastal Commission memorandum consistent with Public Resources Code section 30253, stating that any new development must " '[a]ssure stability and structural integrity, and neither create nor contribute significantly to erosion, geologic instability, or destruction of the site or surrounding area *or in any way require the construction of protective devices that would substantially alter natural landforms along bluffs and cliffs.*' " (Some italics omitted.) In other words, development of the Property was "not reasonably probable" given the "high geologic risks" and the "restrictive land use policies" of both the City and the Coastal Commission.[6] The appraisers were thus unable to identify a "foreseeable economic use" for the Property. Consistent with eminent domain valuation procedures, the appraisers ignored the Project for purposes of their valuation analysis. (See § 1263.330.)

With respect to the parking easement located across the street from the Property, the appraisers were instructed by the City to assume that the parking rights could only be used to support parking *for* the Property. On this basis, the appraisers concluded that the parking easement added only

---

[6] The appraisers' report also referenced Public Resources Code section 30235, which provides in relevant part that seawalls and other structures which alter natural shoreline processes "shall be permitted when required . . . to protect existing structures or public beaches in danger from erosion."

nominal value to the Property because development on the Property was not reasonably probable. Thus, as stated above, the Property had no foreseeable economic use.

Under such circumstances, the appraisers concluded that the highest and best use of the Property was land banking/speculation. They reached their opinion on value using a sales comparison approach based on five sales they identified as limited marketability properties, such as sites with limited to no development potential, sites purchased for low-intensity use, or sites with no access. They acknowledged, however, that they had not found any "identical" sales. Based on the sales, the appraisers extrapolated a price per square foot of $3.50, which they applied to the bluff area of the Property (21,780 square feet) for a total valuation of $76,500.

### 4. The Tongs' Initial Valuation Based on the TDR Ordinance

The Tongs also submitted a valuation statement, which was served in this action in November 2020. Their appraiser, Stanley Tish, opined that the fair market value of the Property was $4.375 million on a valuation date of September 10, 2018. The related analysis stated that the highest and best use of the Property was multifamily residential, with transfer of development rights—i.e., TDRs under the City's TDR ordinance (Pacifica Mun. Code, § 9-4.4200 et seq.; TDR Ordinance).[7] The appraisal described nine relevant transactions of other properties.

The TDR Ordinance at issue was adopted by the City "to provide a mechanism to relocate potential development from areas where environmental or land use impacts could be severe to other areas more

---

[7] The parties stipulated that the trial court should take judicial notice of the TDR Ordinance, and the court approved the stipulation. We similarly take judicial notice of the TDR Ordinance for purposes of this appeal. (Evid. Code, § 459, subd. (a).)

9

appropriate for development, to preserve significant open space resource areas within the City, to encourage protection of natural, scenic, recreational and agricultural values of open space lands, to control development and minimize damage in potentially hazardous and flood prone areas, and to implement the policies of the Seismic and Safety, Open Space and Land Use Elements of the Pacifica General Plan and of the Pacifica Local Coastal Land Use Plan, by the transfer of rights to develop from properties in such areas to qualified properties in other parts of the City, while still granting appropriate residential development rights to each property." (Pacifica Mun. Code, § 9-4.4200.) For purposes of the TDR Ordinance, "development rights" are defined generally as "[t]he residential building rights permitted to a lot, parcel or area of land under the base density of the General Plan and zoning ordinances of the City, measured in maximum dwelling units per acre based upon gross acreage." (*Id.*, § 9-4.4201, subd. (a).)

The TDR Ordinance contemplates transfer of the "number of dwelling units permitted to be built" on a "sending parcel" to a "receiving parcel" under specified circumstances. (Pacifica Mun. Code, § 9-4.4202.) A "sending area" is an "undeveloped area that is designated in [the TDR Ordinance] or by further action of the [City] Planning Commission as one from which it is appropriate to transfer development rights." (*Id.*, § 9-4.4201, subd. (b).) "A sending parcel or site is an undeveloped parcel or site located in a sending area." (*Ibid.*) A "receiving area" is an "area that is designated in [the TDR Ordinance] or by further action of the [City] Planning Commission as appropriate for residential development beyond its base density through the transfer of development rights. (*Id.*, § 9-4.4201,

10

subd. (c).) "A receiving parcel or site is one located in a receiving area." (*Ibid.*)

The Tongs stipulated that they have never applied for transfer of TDRs from the Property, and the City has never issued a TDR permit for the Property. Nor has the City Planning Commission (Planning Commission) ever approved or denied a TDR permit for the Property. Indeed, the City has only received one application for a TDR permit—a request for a transfer within the same parcel—which it granted. Moreover, the Property is not located within any of the sending areas designated by the TDR Ordinance. (See Pacifica Mun. Code, § 9-4.4203.) Under such circumstances, the Tongs would need to apply to the Planning Commission for approval as a sending area. (*Id.*, § 9-4.4203, subd. (b).) Criteria used by the Planning Commission for approval of other sending areas includes: "(1) Suitability of the area for development; [¶] (2) Existence of any physical hazards or constraints to development, such as slope, wave action, or erosion; [¶] (3) Area size; and [¶] (4) Whether the natural, scenic, recreational, open space or agricultural values of the proposed sending area are such as to warrant preservation." (*Id.*, § 9-4.4203, subd. (c).) The Planning Commission has discretion whether or not to approve additional sending areas and/or any specific TDR application. (*Id.,* §§ 9-4.4203, subd. (b) & 9-4.4207, subd. (c)(2).)

### 5. Dueling Motions for Determination[8]

On March 1, 2021, the Tongs filed a motion for determination under section 1260.040, seeking an order that the City's TDR Ordinance

---

[8] Section 1260.040 provides a mechanism, akin to a motion for demurrer or summary adjudication, through which a party may obtain early resolution of a dispute affecting valuation. (See generally *Weiss v. People ex rel. Dept. of Transportation* (2020) 9 Cal.5th 840, 852–856.)

11

authorizing the transfer of residential development rights from certain parcels to certain other parcels bore on the valuation of the Property and that evidence regarding those rights was admissible with respect to the determination of just compensation for the Property. Specifically, the Tongs requested an order determining that the rights of property owners set forth in the TDR Ordinance "constitute a portion of the 'bundle of interests' in property rights" that the City sought to acquire by eminent domain, and that expert testimony with respect to the rights of property owners under the TDR Ordinance "constitutes admissible evidence with respect to the determination of fair market value and just compensation." In support of their motion, the Tongs detailed how the Property fit the requirements for designation as a sending site. Noting that the Fifth Amendment requires a property owner to " '**be put in as good position pecuniarily**' " as they would have been absent the taking, the Tongs argued that just compensation for the Property should "reflect the value of the development rights that would be transferred away at a price to be paid by the purchaser, all according to proof of the amount at trial."

The City responded, filing its own motion for determination, seeking an order "precluding any valuation at trial that assumes the existence of a TDR permit or TDRs at the Property." The City characterized the Tongs as "outrageously seek[ing] to profit from the City's efforts to protect public infrastructure." It also stressed that there is no protected property right in a discretionary permit and that the Tongs had never applied for TDR rights with respect to the Property. In addition, it was not "reasonably probable" that the Planning Commission would issue such a TDR permit.

After argument on May 5, 2021, the matter was submitted and the trial court indicated it would prepare an order, but no such order appears in our

12

record. Moreover, the minute order for May 5 does not indicate any ruling was made on that date. Indeed, the City filed its second final offer of compensation on May 14, 2021, maintaining its previous offer of $76,500, and the Tongs filed their final demand of compensation asking for $2.2 million on May 21, in accordance with their $4.375 million valuation based on a highest and best use of the Property of multifamily residential, with transfer of development rights.

Rather, it appears that the trial court ruled on the motions for determination at the beginning of trial on June 11, 2021, immediately before opening statements. It concluded that it would exclude any evidence of valuation of the Property based on TDRs, granting the City's motion and denying the Tongs' motion. After an opening statement from the Tongs' attorney, essentially asking the court to defer ruling on the motions for determination until it heard the evidence, counsel for the City moved for nonsuit under section 581, subdivisions (a) and (c), arguing that the Tongs' entire case rested on the excluded valuation based on TDRs. The trial court disagreed and continued the matter several weeks to July 2, so the Tongs could submit an amended valuation statement and the City would have time to depose the Tongs' appraiser with respect to his new opinion.

**6.    The Tongs' Revised Valuation Statement**

On June 14, 2021, the Tongs submitted an amended statement of valuation data in line with the court's ruling. Unable to rely on a highest and best use based on transfer of TDRs, their appraiser Tish concluded the highest and best use of the Property was land banking. Tish opined a land banker would consider three facts when valuing the Property: (1) that the City had undertaken the Project no later than January 2017; (2) that the Property would continue to benefit from the TDR Ordinance; and (3) that, by

13

virtue of the Project, the Property would be protected from further bluff erosion and would thus enjoy additional development opportunities which might include a transfer of TDRs. Tish acknowledged that the Property had no current economic use and that there were no relevant comparables. Thus, he based his appraisal on section 1263.320, subdivision (b), which allows for use of a "method of valuation that is just and equitable" under such circumstances.

Specifically, Tish opined that, by taking the Property in fee simple rather than obtaining a temporary construction easement, the Tongs were deprived of the opportunity to either redevelop the Property or consummate a transfer of development rights under the TDR Ordinance after completion of the Project. Given the constraints on the right to redevelop the Property at the time of the taking, the right to redevelop *after* the Project was a significant component of the fair market value lost by the Tongs through the eminent domain process. Tish opined that a land bank purchaser would be willing to pay $2 million on the date of the taking for the right to those possible future development opportunities. Specifically, he looked at comparables based on the possibility of developing either two single family homes or 10 dwelling rate units (eight at market value) on the Property. He also noted that, with any development on the Property, the parking easement would gain value.

On June 29, 2021, the City filed a supplemental trial brief reciting various background facts regarding the Property, including its claim that at "the current rate of bluff retreat, only 15 feet of the blufftop will remain in 4 years."[9] It argued that the Tongs' updated valuation statement still relied

---

[9] As stated above, this claim was based on a consultant's statement in the September 2018 staff report that—at the recent rate of retreat and if left

14

on TDRs and, given the trial court's rulings on the motions for determination, Tish should not be allowed to testify regarding TDRs at trial. The City did not address the Tongs' argument regarding its use of a "just and equitable" method of valuation under section 1263.320, subdivision (b).

The Tongs' supplemental trial brief argued that the trial court's ruling with respect to TDRs did not preclude all reference to them, just valuation evidence assuming the existence of TDR permits or TDRs on the Property. The brief expanded on the Tongs' position that the Property could be valued under section 1263.320, subdivision (b), based on a just and equitable method of valuation and explained that none of the City's " 'comparable sales' " were actually comparable.

The Tongs then explained that their method of valuation at trial would be based on a hypothetical buyer purchasing the Property as a land banker for future appreciation. Under this valuation, the court would need to consider the following questions: Why would a land banker purchase the bluff Property on the Pacific Ocean when it had no current economic return? What potential did the Property have on the date of taking that would cause the land banker to buy it on that date? And, given the anticipated realization of later value, what would a land banker "pay now to hold this Property 'in the bank' "? Thus, "[e]very opportunity that a hypothetical land banking buyer might consider [was] critical to the determination of answers to these questions," including the existence of the TDR Ordinance. In other words, the hypothetical buyer would attribute value to the opportunity to seek and *potentially obtain* designation as a sending site and TDR permit, taking into

_____

unprotected—only 15 feet of the bluff top would remain after four years. The parties did not stipulate to this fact, and, since trial was occurring almost three years later without any site update, the accuracy of this prediction is unclear on this record.

15

consideration the apparent conformance of the Property with the criteria for designating such sites in the TDR Ordinance.

The Tongs also argued at length that, under their proposed method of valuation, the potential for the Project was a known fact at the time of the taking and should be included in the matters a hypothetical land banker would consider. They distinguished this approach from an analysis that would violate the project influence rule: Rather than relying on an enhanced value attributable to the *completion* of the Project, they posited, their analysis was based on what a hypothetical land banker would be willing to pay given the discussions that had already occurred regarding the ongoing efforts to implement and fund the Project.

### 7.     Just Compensation Trial

At trial on July 2, 2021, the court reiterated its ruling not only granting the City's motion for determination but also denying the Tongs' motion, stating that the TDR "isn't going to be part of the valuation." Millard Tong then testified that the apartment buildings were always fully occupied due to their "panoramic, unobstructed view of the entire Pacific Ocean." He charged $150 to $200 per unit for a parking space available across the street pursuant to the easement attached to the Property. Tong acknowledged that he did not pay to have the apartment buildings demolished. He was in chapter 11 bankruptcy at the time, did not have the money to pay for the demolition, and the lienholders refused to fund it. He also agreed that there were unpaid property taxes in excess of $250,000 associated with the Property.

Stanley Tish testified as the Tongs' expert in real estate appraisal. He had been an appraiser since 1983 and had appraised TDRs. In his experience, there was a market of buyers for TDRs. Tish testified about the comparable properties used by the City's appraisers as the basis for their

16

valuation, finding them all distinguishable. For example, one parcel was zoned for agriculture, had no road, and was not on a bluff. Another was unbuildable but was acquired by an adjoining landowner. All but one of the comparables were purchased for specific uses other than land banking. Tish explained that a land banker does not purchase for immediate development. He noted that when there is no comparable data for a property, compensation must be "fair and equitable." (See § 1263.320, subd. (b).)

In Tish's opinion, the Property had a value of $2 million based on the highest and best use of land banking. He acknowledged that the Property was not developable in its current state,[10] but opined that a land bank purchaser would anticipate that farther down the road it could accommodate some development if the bluff was stabilized "by one project or another." He denied his valuation depended upon the completion of the Project.

Tish based his valuation on the Property accommodating either two single family homes or 10 dwelling units (eight market rate units and two affordable units) at some future point. But he acknowledged that there would have to be a downward adjustment from his comparables because they were currently developable while the Property was not. He also agreed that, if only 15 feet of bluff top was left after the stabilization project, it was unlikely that a structure could be built. He could not testify regarding the current state of the bluff, but general plan density was one unit per 2,100 square feet and he based his appraisal on the City's report that, as of June 2017, the bluff top was approximately 21,700 square feet.

---

[10] Specifically, Tish testified that the Property "is severely constrained by environmental hazards regarding bluff erosion from wave action. Under the Local Coastal Land Use Plan, you cannot get approvals to construct an improvement whose useful or economic life would be greater than the anticipated rate of bluff retreat."

Tish testified that his valuation did not include the parking easement because the value would be variable depending on whether the Property remained unimproved or was eventually developed. Since the Property had been transferred to the City soon after the tenants were required to move out, there was no market data available as to whether the 40 spaces could be rented to the residents of nearby apartments buildings as excess parking. When the court asked why the existing Property could not be used for *anything*, Tish responded that, while the Property might be usable for parking or to sell Christmas trees, pumpkins, or other plants, he did not know whether the City would be amenable to rezoning.

Josh Fronen testified as the City's expert appraiser. He had worked as an appraiser for approximately 20 years. He inspected the Property for purposes of appraisal on June 15, 2017. At that time, it was approximately 65 to 70 feet from the edge of the bluff to the sidewalk.

In conducting his appraisal, Fronen spoke with a City planner who confirmed that the Property could not be developed if it needed a protective device to stabilize the bluff. A representative from the Coastal Commission reported a very low likelihood that the Property could be redeveloped due to its history of bluff erosion. He also explained that, since the apartment buildings were no longer on the Property, the riprap the Tongs had placed at the bottom of the cliff would need to be removed or would be subject to daily fines of thousands of dollars.[11] Another representative from the Coastal Commission confirmed that shoreline protection would be needed to develop

---

[11] The estimated cost of such removal was approximately $200,000.

the Property but that development would not be permitted if such protection was a requirement for development.[12]

Fronen was instructed by the City not to consider the cost of riprap removal or the value of the Property's parking easement in appraising the Property. He also did not consider the unpaid taxes for the Property. He opined that the Property was not developable given the existing constraints. He characterized it as very high risk but with good views and good access.

Fronen concurred that the highest and best use for the Property would be land banking—acquiring the Property as a long-term investment. While he did not find any comparables with a "similar detrimental condition" as the Property, he did find some that shed light on value due to having their own development challenges. Based on those comparables, he opined that the fair market value of the Property was $3.50 per square foot of bluff top or $76,500. He questioned the comparables used by Tish for involving actual sales made for development purposes. He had no opinion regarding whether it made sense that governmental entities would not want individual property owners to build their own bluff protection devices.

On cross examination, Fronen testified he was aware that a press release had been issued in January 2017 announcing that the United States Army Corps of Engineers had approved a seawall project by the City

---

[12] Fronen described the development constraints imposed on the Property as a "catch-22." However, neither Fronen nor Tish testified to a valuation based on a possible inverse condemnation with respect to the Property. (See *Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1193 (*Jefferson Street*) [a regulatory action constitutes a per se compensable taking when it " 'deprives the owner of "all economically beneficial or productive use of [the] land" ' "].) Nor did they discuss the fact that statutes like the TDR Ordinance are designed to minimize development in certain sensitive areas without stripping all development rights, which could constitute such a taking.

impacting the Property. The taking occurred in September 2018. However, he ignored the existence of the Project in his valuation as required by eminent domain law. Fronen agreed that the existence of a TDR Ordinance was something a hypothetical land banker would consider, but he had never specifically appraised TDRs.

Under questioning from the court, Fronen admitted he had not visited the Property since June 2017. He agreed that under current zoning an owner could potentially pitch a tent and sit in a lawn chair looking at the ocean.

### 8. Posttrial Briefing

The Tongs filed posttrial briefing in which they argued extensively that the evidence presented by the City was not comparable, had no probative value, and, failed "to 'shed light' on the value of the Property being taken but demonstrate[d] an intent to deviate from customary standards to achieve an artificially low valuation." They suggested that the existence of the seawall project since 2016 would either be on the minds of purchasers generally or, alternatively, a land banker would expect that a governmental agency would install some type of armoring device in the future. The Tongs asserted that the existence of the TDR Ordinance would also be on the minds of purchasers generally. And they reiterated that, if the court found no relevant, comparable market for the Property, it could determine valuation by a method that was " 'just and equitable.' "

In its posttrial briefing, the City stressed the fact that both appraisers agreed the Property was not developable in its current condition. It stated that the Property had essentially no value to the Tongs because, accepting the City's value of $76,500, the Tongs would still be required to pay $200,000 for removal of the riprap at the base of the bluff. It claimed that Tish's

20

valuation relied on distinguishable comparables. And it argued that Tish's opinion violated the project influence rule.

In reply briefing, the Tongs argued that the project influence rule was inapplicable and that the City had waived application of the rule by failing to object to evidence regarding the seawall project. Based on *Merced Irrigation Dist. v. Woolstenhulme* (1971) 4 Cal.3d 478 (*Woolstenhulme*), the Tongs argued that the trial court was allowed to consider facts with respect to the Project known prior to the condemnation and that such facts would properly be considered by a land banker.

### 9.    Decision of the Court

The trial court filed its amended final statement of decision on April 27, 2023. It found the fair market value of $2 million was "the fair, just and reasonable compensation" for the City's taking of the Property. In doing so, it noted that a property owner is entitled in this context to be reimbursed for the actual value of what he or she has lost, but no more. And it cited to the definitions of fair market value set forth in subdivisions (a) and (b) of section 1263.320 and Evidence Code section 823.

The court described the Property with reference to the facts stipulated to by the parties at trial. It summarized Millard Tong's testimony as follows: "The Property (excluding the Easement across the street) includes flat land on a bluff above the Pacific Ocean. The Property has a panoramic, unobstructed view of the Pacific Ocean, with a beach below. There is nothing comparable in the County." The court further summarized Tong's testimony, explaining that the Property was purchased by the Tongs for $6 million as a commercial real estate investment with the two apartment buildings already existing; the 40 units in the two buildings had a 100 percent occupancy rate;

and the Property included the parking easement for 40 spaces across the street, for which the Tongs charged $150 to $200 per unit.

When the Tongs were told they had to demolish the apartment buildings for health and safety purposes, they were unable to do so because of the existing bankruptcy and their lienholders' refusal to approve funds for that purpose. The City demolished the buildings at its expense. Thereafter, the Tongs "apparently received a bankruptcy discharge of debts [citation] and [have] no liability to reimburse [the City] for its demolition of the buildings."

The court also found, based on Fronen's testimony, that the flat area of the Property was 65 to 70 feet from the edge of the bluff to the sidewalk. In addition, it found, based on admitted deposition testimony from the City's Planner, that "it is possible to be able to engineer and design construction development on the Property if the person is wealthy enough to bear the expenses to do so."

With respect to valuation, the court noted that neither party had the burden of proof with respect to just compensation (§ 1260.210, subd. (b)) and that both experts agreed that the highest and best use of the Property was land banking. Both experts used comparable sales as their method of valuation. The court further stated that Tish's initial valuation was excluded because "it was based upon the value of TDRs at the Property."

The court stated that the City's appraisal had been conducted in June 2017 and the date of the taking was in September 2018, but Fronen, the City's appraiser, did not submit an updated report because he stated there was no interim change in value. The court faulted Fronen's comparables because "*none* were in Pacifica*, none* were zoned R3, and *none* were located along the California coast with the exception of one sewerage property." And it stressed that Fronen had not valued the parking easement. Although the

22

Property is "unique," Tish testified to comparables located in the geographic area of the San Mateo County coast, including Pacifica. "Tish testified that a willing buyer interested in land banking would contemplate future appreciation of [the Property]—which the evidence shows is a beautiful and unique location at the seashore, upon a bluff, with a panoramic unobstructed view of the Pacific Ocean."

The trial court rejected the City's assertion that Tish's valuation ran afoul of the project influence rule (section 1263.330) because it assumed that the Project had been completed. According to the court, the Tongs sought the present value (as of September 2018) based upon a *current* willing land-banking buyer's consideration of possible future development or use of the land; *not* the future value itself. Moreover, "Tish testified that the Property was taken by the [City] for the purpose of its Project to reinforce and stabilize the shear bluff from any further erosion. This would involve the bluff 'face' and the beach. So the possibility of future development of the top flat land already existed at the time of the taking. According to Tish, this was an opportunity taken from [the Tongs] by [the City]." Citing *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 869 (*Decker*), the court concluded this evidence did not violate section 1263.330, but instead was relevant to show a use of the Property in the hands of the purchaser and not as part of the Project. Put another way, "[t]he eminent domain was of vacant land for a seawall. There is no evidence presented of any specific plans of [the City] for use of the property thereafter."

Finally, in concluding that the fair market value of the Property was $2 million, the trial court expressly found "the testimony of [Tong] and expert Tish to be more reasonable and persuasive." In contrast, the court found the opinion of expert Fronen "defie[d] common sense."

23

On May 22, 2023, the trial court granted the Tongs' motion to increase the amount of the City's deposit to $2 million, the probable amount of compensation that would be awarded in the proceedings. The court ordered the City to deposit the increased amount within 30 days, and the City did so. Judgment was entered on June 5, 2023, indicating that, in addition to the $2 million for the Property, the Tongs were entitled to statutory interest, as well as attorney fees and costs in an amount to be determined upon filing of a motion for fees and memorandum of costs. The Tongs' recovery would be reduced in the amount of the unpaid real property taxes and penalties they owed to the San Mateo County Tax Collector with respect to the Property. The City timely appealed (case No. A168115). And the Tongs timely filed their notice of cross-appeal on July 10, 2023.

## D.    *Request for Litigation Expenses*

Meanwhile, the Tongs filed a motion requesting litigation expenses on July 3, 2023, under section 1250.410. Pursuant to that statute, the parties to a trial on compensation issues must each submit a final offer/demand for compensation at least 20 days before trial. (§1250.410, subd. (a).) If, after trial, the court "finds that the offer of the plaintiff was unreasonable and that the demand of the defendant was reasonable viewed in the light of the evidence admitted and the compensation awarded in the proceeding," the defendant is entitled to litigation expenses, including reasonable attorney fees, expert witness fees, and appraiser fees. (*Id.*, subds. (b) & (e).) Here, the Tongs sought attorney fees of $312,920, expert witness fees of $4,590, and appraisal fees of $49,792.

The City opposed the motion, asserting that its offer was reasonable, the Tongs' offer was unreasonable, and the requested litigation expenses were excessive and unreasonable. After argument on September 6, 2023, the

24

court issued its order granting the Tongs' motion on October 23, 2023. Specifically, the court found that the City's offer was unreasonable and the Tongs' offer was reasonable. It awarded the uncontested amount of $312,920 in attorney fees and $11,343.40 in costs. It adjusted the expert and appraiser fees downward slightly for a total of $48,346.20.

On December 6, 2023, the City filed a notice of appeal from the court's order awarding litigation expenses (case No. A169273). On February 2, 2024, the court filed its amended judgment in condemnation, memorializing the amounts payable for interest ($94,516.43), and the costs and litigation expenses already mentioned. The City filed a notice of appeal from the amended judgment on February 7, 2024 (case No. A169714). And the Tongs filed a notice of cross-appeal from the amended judgment on February 13, 2024. On February 29, 2024, we granted the parties' joint motion to consolidate these three related appeals for purposes of briefing and oral argument. On April 24, 2024, we granted the Tongs' unopposed motion for calendar preference in this matter.

## II. DISCUSSION

### A. *The Project Influence Rule*

The crux of this appeal is the parties' dispute regarding whether the trial court's valuation of the Property violated the project influence rule (§ 1263.330) because it considered increases in value flowing from the Project when setting the fair market value for the Property at $2 million. According to the City, the trial court improperly adopted the Tongs' argument that "because a hypothetical 'land banker' would have considered the City's Project, the Property should be valued as if it had been, or imminently would be, stabilized by the Project and thus would be suitable for future residential development." This, it urges, is a clear violation of the project influence rule.

25

The Tongs counter that this case falls within an established exception to the project influence rule, thus allowing for consideration of project-enhanced value up to the time the Property was " 'pinpointed' to be condemned for inclusion in the [P]roject."  On this issue, we conclude the City has the better argument.

### 1.    Legal Framework

"The state and federal Constitutions guarantee real property owners 'just compensation' when their land is taken for a public use.  [Citations.] This constitutional guarantee is ' "designed to bar [g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." ' " (*Jefferson Street*, *supra*, 236 Cal.App.4th at p. 1192.)  Just compensation in this context means " ' "the full and perfect equivalent in money of the property taken.  The owner is to be put in as good position pecuniarily as [he or she] would have occupied if [their] property had not been taken." ' " (*City of San Diego v. Rancho Penasquitos Partnership* (2003) 105 Cal.App.4th 1013, 1027.)  " ' " 'The word "just" in the Fifth Amendment evokes ideas of "fairness" and "equity." ' " ' " (*Id.* at pp. 1027–1028.)  Thus, while condemnees must be made whole, they are not entitled to more.  (*Redevelopment Agency v. Tobriner* (1989) 215 Cal.App.3d 1087, 1098.)  In other words, "the condemnee is entitled to be reimbursed for the actual value of what he or she has lost—no more and no less." (*Ibid.*)

It had "long been established" that just compensation is measured by the market value of the property at the time of the taking.  (*Woolstenhulme*, *supra*, 4 Cal.3d at p. 488; see § 1263.310.)  As mentioned above, fair market value is generally defined in this context as "the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under

26

no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available." (§ 1263.320, subd. (a).)  However, "[t]he fair market value of property taken for which there is no relevant, comparable market is its value on the date of valuation as determined by any method of valuation that is just and equitable."  (*Id.*, subd. (b); accord, Evid. Code, § 823 ["Notwithstanding any other provision of this article, the value of property for which there is no relevant, comparable market may be determined by any method of valuation that is just and equitable."].)

In addition, given the principle that a condemnee is not entitled to more than he or she lost, "when assessing fair market value (including its highest and best use and the reasonable probability of a zoning change), any increase or decrease in the property's value *caused by the project for which the property is condemned* may not be considered.  Thus, to the extent the fair market value of the property condemned increases or decreases because of the project for which it is condemned, or the eminent domain proceeding in which the property is taken, or any preliminary actions of the condemnor relating to the taking of the property, such project-caused increases or decreases must be excluded from the just compensation calculus."  (*City of San Diego v. Barratt American, Inc.* (2005) 128 Cal.App.4th 917, 934.)  This formulation is sometimes referred to as the "project influence rule" and is codified in section 1263.330.  Pursuant to that statute:  "The fair market value of the property taken shall not include any increase or decrease in the value of the property that is attributable to any of the following: [¶] (a) The project for which the property is taken. [¶] (b) The eminent domain

proceeding in which the property is taken. [¶] (c) Any preliminary actions of the plaintiff relating to the taking of the property." (§ 1263.330.) The seminal case considering the scope of the project influence rule is *Woolstenhulme, supra*, 4 Cal.3d 478. There, the condemnor for many years had been developing plans for a new water project that would significantly increase the size of an artificial lake, the impact of which would provide neighboring properties with power, water, and increased recreational facilities. By 1962, the condemnor had begun a "quest for federal funds to assist in the financing of the project, and early in 1963 several newspaper articles informed the public that the completed Lake McClure project would include recreational facilities, such as camping, boating and fishing." (*Id.* at pp. 484–485.) When the public learned of the general plans, property values in the area began to increase, although the precise footprint of the project was unknown. However, by January 1, 1965, the plans for the project had progressed to a point at which it became " 'reasonably probable' " the defendant's property would be taken for the project. (*Id.* at p. 485.)

The Supreme Court explained: "Because the definite commencement of a public project is almost invariably preceded by significant publicity and public interest, land values in the vicinity of the potential project often will increase in response to this foreknowledge. A recurring issue in eminent domain litigation is whether, and to what extent, such increases in land values attributable to the proposed project comprise a proper element of the 'just compensation' to be paid to a landowner if his land is ultimately taken for a project." (*Woolstenhulme, supra*, 4 Cal.3d at pp. 483–484.) The court then refined the general project influence rule—that a property owner is never entitled to be compensated for project-enhanced value—by distinguishing three different types of project-enhanced value. Specifically,

28

the court opined: "The value of land can be said to increase 'by reason of the proposed improvement' [citation] for at least three distinct reasons: (1) the worth of *property known to be within the project* may rise when the land is valued *as part of* the proposed improvement rather than as a separate tract of land; (2) the value of *property expected to be condemned* may rise because of the anticipation that the condemner will be required to pay an inflated price for the land at the time of condemnation; and (3) the value of *property expected to be outside of the proposed improvement* may rise because it is anticipated that the land will reap the benefits resulting from *proximity* to the coming project." (*Id.* at p. 490.)

The court concluded that although the general rule against compensating a property owner for the project-enhanced value applies to appreciating value attributable to the first two scenarios, a property owner is entitled to be compensated for appreciating property value under the third scenario. (*Woolstenhulme*, *supra*, 4 Cal.3d at pp. 488–495.) The court explained: "In the early stages of a desirable project's development, land which is expected to be within the vicinity of the project, but is not expected to be taken for the project, will naturally increase in value, and a landowner who chooses to sell such land at this time will gain the benefit of this incremental value; similarly, one who buys such land at this time must pay this incremental amount for his purchase. It is not until a particular piece of property is reasonably expected to be condemned for the project that this enhanced market value, attributable to the land's anticipated proximity to the improvement, disappears. We have determined that it would be unfair, in computing just compensation, to eliminate the appreciation in market value which a specific piece of property in fact enjoyed before it was designated for condemnation, since that would in effect deny to the owner the

29

market value of [his or her] property prior to the time it was pinpointed for taking." (*Id.* at p. 484; see *Decker, supra,* 18 Cal.3d at p. 869 [Evidence that the city had found there was a present need for airport parking and that defendant's property was part of the area found suitable for such a use admissible under *Woolstenhulme.* "The city's determination as to the adaptability of the property for airport parking purposes was relevant to show that the *property in the hands of defendant and not as part of the project* could have been used for airport parking."].)

Woolstenhulme, however, recognized that "in practice, the segregation of those cases in which 'enhancement' should be compensable from those in which it should not will often entail a difficult task." (*Woolstenhulme, supra,* 4 Cal.3d at p. 495.) The court discussed various scenarios for determining when public announcement of a project sufficiently targets a property for inclusion to render project-enhanced value noncompensable. When the first announcement of an improvement makes it definite that certain land will be included in the project, "since the public knows that the land will not receive the benefits of proximity to the project, the market value of the property will experience no such enhancement." (*Id.* at p. 496.) Even where the first announcement of a project does not forecast " 'definite inclusion' " due to the "notoriously slow" pace of "[g]overnmental bureaucratic action," when potential purchasers and sellers can "reasonably foresee" that a given tract of property will probably be taken for the improvement, any increase in value is noncompensable under the project influence rule. (*Id.* at pp. 496–497.)

In sum, "enhancement value should not be includable in 'just compensation' whenever the condemned lands 'were probably within the scope of the project from the time the Government was committed to it.' " (*Woolstenhulme, supra,* 4 Cal.3d at p. 497*,* quoting *United States v. Miller*

30

(1943) 317 U.S. 369, 377.)  Owners are entitled to be compensated for increases in value that occur during the period when "it was not likely that [the] land would be condemned." (*Woolstenhulme*, at p. 497.)  That entitlement ends "once it becomes reasonably foreseeable that the land is likely to be condemned for the improvement." (*Ibid.*)

## 2. Standard of Review

The parties disagree on the appropriate standard of review in this context.  According to the City, the application of the project influence rule is an interpretation of statute requiring de novo review.  The Tongs characterize the dispute regarding the project influence rule as one over the introduction of evidence, subject to review for abuse of discretion.  The Tongs make an associated forfeiture argument, positing that the City's failure to object to the introduction of Tish's opinion of value at trial forfeited any appellate argument flowing from the trial court's adoption of that opinion. The Tongs cite *Woolstenhulme* for the proposition that "[w]here a party objects to the admission of valuation evidence on the grounds that the evidence may violate the project effect rule, the trial court's ruling is reviewed under the abuse of discretion standard."

In making their claim, the Tongs "confound[] th[e] substantive rule of compensation with the question of the *admissibility* of [valuation evidence]." (*City of Los Angeles v. Retlaw Enterprises, Inc.* (1976) 16 Cal.3d 473, 480.) Contrary to the Tongs' argument, *Retlaw* explained *Woolstenhulme*'s holding on admissibility of evidence: the trial court is empowered to admit evidence of comparable sales "bloated by project enhanced value for which the owner of the condemned property [can] claim no compensation" if the court (1) finds the sales "sufficiently comparable to the condemned property to shed light upon its value"; (2) permits cross-examination on comparability by the

31

opposing party; and (3) cautions the jury to disregard such sales "to the extent that they reflected noncompensable project enhancement." (*Retlaw*, at p. 481.)

The City did not, and consistent with *Retlaw* could not, argue that Tish's opinion of value was inadmissible. Instead, the City argues that the trial court violated section 1263.330 by adopting the portions of Tish's opinion relying on project-enhanced value. Section 1236.330 categorically prohibits inclusion of project influence in the fair market value of condemned property. The facts about the Property and the Project that the trial court relied upon in making its determination were largely undisputed. We agree with the City that the trial court's ruling applying section 1263.330 is a question of statutory interpretation requiring de novo review. (Compare *Emeryville Redevelopment Agency v. Harcros Pigments, Inc.* (2002) 101 Cal.App.4th 1083, 1095 (*Harcros Pigments*) [admission of evidence subject to de novo review on appeal where it was admitted in violation of statute and the facts were largely undisputed].) We therefore also reject the Tongs' forfeiture arguments regarding the City's failure to object to the admission of Tish's opinion evidence.

### 3. The Trial Court Violated the Project Influence Rule

The Tongs' expert appraiser (Tish) repeatedly referred to the Project in his amended valuation of the Property and his testimony at trial. For example, the amended valuation posited that a prospective land banker on the valuation date would consider that the City had undertaken the Project not later than January 2017 and, that "by virtue of the project," the Property would be protected from additional bluff erosion and "enjoy additional potential uses and development opportunities." Similarly, at trial Tish testified that a hypothetical land bank purchaser would consider that the

Project "had begun some two or three years prior to the taking" and thus the Property "would be protected from any additional bluff erosion." And Tish concluded that the City's acquisition of the Property deprived the Tongs "of the opportunity to redevelop the property once the bluff is stabilized."

In addition, the Tongs' supplemental trial brief and posttrial briefing both relied on the Project. The supplemental trial brief argued that a hypothetical land banking purchaser would value the property based on the City's Project to construct a "seawall to protect the entire 300 block of Esplanade Avenue from any further bluff retreat." The briefing quoted extensively from the City's January 2017 press release for the Project when arguing that it was proper for Tish to consider that (1) "[t]he seawall project started as early as February 2016"; (2) "[t]he seawall project pertained to the entire 300 block of Esplanade Avenue"; and (3) "[t]he purpose of the seawall project was to prevent bluff retreat." Similarly, the Tongs' posttrial briefing contended that the Project "was a known fact . . . and would be a factor in the evaluation of future increases in value by a land banker buyer" and that Fronen had erred by disregarding the Project's alleged impact on the value of the Property.

The January 2017 press release, in turn, explained that in January 2016 the City "declared a State of Local Emergency in response to storm damage to several City sites. By the end of winter, City infrastructure had been damaged in 12 separate locations." However, the City had obtained insurance and grant funds to cover the majority of the repair costs. The press release additionally disclosed that the Project had been approved for study by the United States Army Corps of Engineers (ACE) as part of its CAP Section 103 program and might also be eligible for state grant funds. The Project was described in the press release as follows: "310–330 Esplanade

Infrastructure Preservation. Bluff face reinforcement/revetment of 300 block of Esplanade Ave. between the Oceanaire Apartment Homes (formerly Lands' End Apartments) and the Bluffs at Pacifica Apartments. The goal of this project is to protect the adjacent street and utilities. Estimated cost $5 million."

Based on these clear references to project-enhanced value, the City asserts that the trial court's reliance on Tish's opinion violated the project influence rule by (1) valuing the property as part of the project for which it was taken and (2) including increases in value that occurred due to the City's preliminary actions relating to the taking of the property. The Tongs counter that the City's submission of plans to the ACE in 2016, coupled with its public announcement of the Project in January 2017, made the Project an " 'existing fact' " in September 2018 that a hypothetical land banking speculator would properly consider. The Tongs therefore argue that any project-enhanced value included in Tish's opinion falls within the exception to the project influence rule identified in *Woolstenhulme* and codified in section 1263.330.

As discussed above, the Supreme Court created an exception to the project influence rule in *Woolstenhulme* based on the rationale that a property owner should be allowed to share in the appreciation caused by proximity to a project up until the point it becomes "reasonably foreseeable that the land is likely to be condemned for the improvement." (*Woolstenhulme*, *supra*, 4 Cal.3d at p. 497.) To the extent that fair market value relies on value generated by "existing facts" related to the project, those facts must have become generally known prior to the property's probable inclusion in the project for which it is ultimately condemned to fall within the *Woolstenhulme* exception.

34

In concluding that the project influence rule was inapplicable on these facts, the trial court distinguished between the development potential of the bluff top and the beach, stating that "the Property was taken by the City of Pacifica for the purpose of its Project to reinforce and stabilize the shear bluff from any further erosion. This would involve the bluff 'face' and the beach. So the possibility of future development of the top flat land already existed at the time of the taking." The trial court also acknowledged in response to the City's objections that "experts for both sides testified that the Property is not developable currently or at the time of the taking." The possibility of future development at the top flat land required completion of the Project. In order to find that a hypothetical land banker could value the Property assuming completion of the Project without violating the project influence rule, the trial court was required to conclude that it was not "reasonably foreseeable" in January 2017 that the Property was "likely to be condemned for the improvement." (*Woolstenhulme*, *supra*, 4 Cal.3d at p. 497.)

The trial court's necessarily implied conclusion that it was not "reasonably foreseeable" in January 2017 that the entire Property would be condemned (rather than just the bluff face) was erroneous as a matter of law. The City's 2016 application to the ACE for project funding referenced in the 2017 announcement included a map of the proposed seawall at beach level extending across the entire face of the bluff below 310 and 320 Esplanade Avenue. The map superimposed a drawing of the project on an aerial photograph taken on January 27, 2016, when the former apartment buildings were still standing. The Project name as announced to the public included the street addresses of the Property. From the inception of the Project, it clearly targeted the Property.

35

*Woolstenhulme* contemplated that speculators might act unreasonably in the face of a condemnation announcement, and for that reason chose " 'probable inclusion' " as the benchmark for determining when a property's increase in value becomes noncompensable under the project influence rule. "[I]t is possible that there may be some project enhancement of value even after [reasonable foreseeability of condemnation], for some potential purchasers may conceivably be willing to pay more for such property in the hope, however remote, that ultimately the property will not be taken for the improvement. . . . Because, as a practical matter, it would be impossible to determine the precise source of an increase in actual market value, and since those who purchase property after the date of probable inclusion voluntarily assume the risk of condemnation, we believe that the date of 'probable inclusion' constitutes the most appropriate 'cut-off' date for project enhancement." (*Woolstenhulme, supra*, 4 Cal.3d at pp. 497–498, fn. 11.) Tish's hypothetical land speculator in this case is such a purchaser—relying on the remote hope that the Property targeted for inclusion from the Project's outset might be only partially condemned, and that the Project-stabilized bluff top would then support future residential development not possible at the time of the taking due to decades-old statewide coastal land use policy.[13]

The trial court's conclusion that the "possibility of future development of the top flat land already existed at the time of the taking" relied on

---

[13] The California Coastal Act of 1976, is a " ' "comprehensive scheme to govern land use planning for the entire coastal zone of California," ' " mandating careful planning of coastline development through local agency issuance of coastal development permits overseen by the Coastal Commission. (*Wall v. California Coastal Com.* (2021) 72 Cal.App.5th 943, 948, citing *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 793–794.) Such permits are " ' "not solely a matter of local law, but embody state policy." ' " (*Ibid.*)

36

assumed Project completion that violated section 1263.330. Undisputed trial evidence established that as of January 2017, the flat bluff top land was vacant. The City had been required to demolish existing apartment buildings whose foundations had been severely undermined by bluff retreat at the site that had been ongoing since 2002. Every expert agreed that the Property could not be developed without bluff stabilization. Once the apartments were razed, any future development would be subject to Public Resources Code section 30253, subdivision (b)'s prohibition on issuance of permits for new development requiring the construction of a seawall. The Pacifica Local Coastal Plan Seismic and Safety Element contains a policy prohibiting projects requiring seawalls as a mitigation measure. Nor were those regulations recent—the Coastal Commission's 2003 memorandum discussing requirements for new development tracked language that has existed in the Public Resources Code without substantive change since 1976.

Despite acknowledging that the Property was not developable in its current state, Tish opined that the value being taken from the Tongs was "the opportunity to redevelop the property once the bluff is stabilized." Since the January 2017 Project announcement targeted the Property for probable inclusion at its inception, Tish's hypothetical land bank buyer's assignment of value to the Project as an "existing fact" at the taking in September 2018 does not fall within the *Woolstenhulme* exception to the project influence rule. Thus, the trial court's reliance on it in determining the property's value was error.

## C.  *Substantial Evidence Supported the Trial Court's Valuation*

It is axiomatic that we review the trial court's rulings and not its reasoning. (*Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 336.) "Even if the trial court articulates the wrong

37

reasons when arriving at a correct conclusion, we will presume the judgment correct and affirm it on any ground supported by the evidence, whether articulated by the trial court or not." (*In re Marriage of Brooks* (2019) 33 Cal.App.5th 576, 593.) Having concluded that the trial court violated the project influence rule in determining its valuation of the Property, we consider whether substantial evidence in the record nevertheless supports the trial court's determination that the Property was worth $2 million at the time of taking.

Both parties agree that the trial court's award determination is reviewed for substantial evidence. (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1134 (*Zuckerman*).) Substantial evidence is evidence which is reasonable, credible, and of solid value. (*Kuhn v. Department of General* Services (1994) 22 Cal.App.4th 1627, 1633.) "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . . *If such substantial evidence be found, it is of no consequence that the trial court, believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874.)

"Courts, both trial and appellate, have the responsibility of insuring that an expert's determination of value takes into account only reasonable and credible factors." (*Zuckerman, supra,* 189 Cal.App.3d at p. 1134.) Experts may only rely on matter "of a type that reasonably may be relied upon by an expert in forming an opinion as to the value of property." (Evid.

Code, § 814.)  Comparable sales may be used as a basis for opinion of fair market value.  (Evid. Code, § 816.)

To be comparable, the sale must have been made "sufficiently near in time to the date of valuation, and the property sold must be located sufficiently near the property being valued, and must be sufficiently alike in respect to character, size, situation, usability, and improvements, to make it clear that the property sold and the property being valued are comparable in value and that the price realized for the property sold may fairly be considered as shedding light on the value of the property being valued." (Evid. Code, § 816.)  Under the comparable sales approach, "the appraiser identifies sales of properties deemed to resemble the condemned property in relevant respects, and then derives a market value for the condemned property from the prices paid for these 'comparables,' typically adjusting the price to reflect such matters as material differences between the properties and differences in market forces between the time and location of the comparable sale and that of the property being valued." (*Harcros Pigments*, *supra*, 101 Cal.App.4th at p. 1094.)

As discussed above, Tish identified a land banker's primary consideration in valuing the future development potential of the Property as the anticipation of a stabilized bluff.  Tish opined that a land banker would anticipate the ability to construct either a 10-unit dwelling or two single-family homes on the site once the bluff was stabilized.  The trial court could not rely on this testimony without violating the project influence rule, and we do not consider it in evaluating whether substantial evidence remained to support the trial court's adoption of Tish's opinion of value.

In addition, the trial court made the following express findings about the nature of the Property independent of its potential for future residential

development, and largely undisputed.  The Property consists of two parcels totaling 74,760 square feet.  The Property includes flat land on a bluff above the Pacific Ocean.  The Property has a panoramic, unobstructed view of the Pacific Ocean and a beach below.  The Property includes an easement for parking rights to 40 parking spaces across the street, which previously generated $150 to $200 each when leased to tenants.  At the time of Fronen's appraisal, 65 to 70 feet of flat bluff remained west of the sidewalk.

Both appraisers identified the highest and best use of the Property as land banking.  Each agreed that the property could not be developed cost-effectively at the time of taking, and that a land banker would assign value based on the possibility of appreciation or future development.  Both experts relied on the comparable sales approach, expressly permitted by Evidence Code section 816.  Of all of the comparable sales identified by both experts, only one of Fronen's was a land banking transaction.

The trial court made express findings about Fronen's testimony independent of its reliance on the parts of Tish's opinion that violated the project influence rule.  The trial court found Fronen's opinion "defies common sense" because it gave zero value to the parking easement, gave zero value to the majority of the Property's square footage, valued the beach portion of the Property at zero because it was not exclusive ownership, and chose a per-square-foot value of $3.50 for coastal land with 180+ degree ocean views.  The trial court implied that Fronen's report was outdated, valuing the property as of June 5, 2017, when the date of taking was September 2018.  Further, the trial court faulted Fronen's dissimilar comparables, finding that "*none* were in Pacifica, *none* were zoned R3, and *none* were located along the California coast with the exception of one sewerage property."  All of these criticisms

40

were well within the scope of the trial court's discretion as finder of fact and led the trial court to reject Fronen's opinion of value outright.

Fronen's comparables were introduced as part of trial exhibit 12. In addition to the problems the trial court identified with Fronen's opinion of value, his comparables suffered other dissimilarities to the Property. He did not identify a single sale that occurred within one year of the taking. The dates of sale ranged from April 2010 to July 2016. The prices per square foot ranged from $0.29 to $3.62. The highest price per square foot was the April 2010 sale of the "sewerage property" referenced in the trial court's "Amended Final Statement of Decision." The "comparable" property that sold for $0.29 per square foot was a heavily wooded hillside in Los Gatos so steep that it was "unbuildable," which sold to an adjacent landowner for $7,000.[14]

Tish testified that Fronen's identified sales were not relevant comparables. Tish's report and testimony identified the comparables he opined were relevant. All of Tish's identified comparable sales were of property presently capable of development. He selected sales within the City of Pacifica, including land "suitable for multi-family residential development" and "sales of coastal home sites." Tish acknowledged that some of his comparables had sold with approved plans or entitlements, and that those comparables would require a "downward adjustment." The specifics of Tish's comparable sales were introduced as part of trial exhibit 58. The price per square foot of Tish's comparable sales ranged from $1.80 to $100.93. The sale

---

[14] Fronen testified that he looked for properties that had sold with "development challenges." Even using that rubric, a development challenge caused exclusively by topography incompatible with building is dissimilar from one caused primarily by a strict regulatory approach to building on coastal flat land. The trial court was well within its discretion to be skeptical of this approach.

dates ranged from February 2015 to December 2019, and included one listing that had not resulted in a sale. Tish's report identified five comparable completed sales that occurred within one year of the date of the taking of the Property, and only one that occurred within six months of the date of taking. For the sale closest in time to the date of taking, the price per square foot was $65.89. For the five sales occurring within one year of the taking, the price per square foot ranged from $1.80 to $65.89. The average price per square foot of the properties sold within one year of the taking was $50.17. By comparison, valuing the Property at $2 million resulted in a price per square foot of $26.75,[15] a significant downward adjustment to take into account the Property's current development issues and which did not even include any value related to the parking easement.

Examining the evidence in the record in the light most favorable to the judgment, substantial evidence supports the trial court's adoption of Tish's $2 million valuation, even after excluding his improper reliance on Project completion. Experts are expressly permitted to use comparable sales to opine on the fair market value of property. (Evid. Code, §§ 814, 816.) And, as typically used, the method contemplates adjustments to value to compensate for dissimilarities of comparable sales to the condemned property. To be comparable, sales must be "sufficiently near in time to the date of valuation." (Evid. Code, § 816.) None of Fronen's comparable sales met that description, but some of Tish's did. Comparable sales must be "located sufficiently near the property being valued." (*Ibid.*) None of Fronen's were in the same city, and two were outside the county. All of Tish's were in the City of Pacifica. Comparable sales must be "sufficiently alike in respect to character, size, situation, usability, and improvements to make it clear that the property sold

_____

[15] 2,000,000/74,760 = 26.75.

and the property being valued are comparable in value." (*Ibid*.) Given the trial court's apt observation of the unique nature of the property, none of the comparables offered by either expert met that description particularly well. The trial court was required to determine whether either expert's comparables were "sufficiently" alike to shed light on the value of the Property. As the trial court observed, none of Fronen's comparables had similar zoning to the Property. Some of Tish's did.[16]

A reasonable finder of fact could have rejected Fronen's opinion of value outright for the dissimilarity of his comparable sales and the inadequately explained decision to assign no value to the parking easement. A reasonable finder of fact could have found Tish's proposed comparable sales more appropriate applying Evidence Code section 816. A reasonable finder of fact could have concluded that Tish's substantial downward adjustment from those comparables to compensate for the dissimilarity of their development potential to that of the Property was an appropriate calculation of value. The trial court's valuation here resulted in a price per square foot of less than half of the closest-in-time, geographically proximate comparable sale, and a price per square foot just over half of the average price per square foot of the five closest-in-time, geographically proximate comparable sales. The data available in the record to support that determination was neither "speculative, remote or conjectural" as argued by the City. Substantial trial

---

[16] The City's briefing criticizes the lack of general plan designation and zoning information in Tish's report. Tish testified that his comparables all involved land suitable for multifamily residential development or coastal home sites, so the record permits the reasonable inference that at least some of his comparables were zoned more similarly to the Property than Fronen's.

evidence supports the trial court's determination of value based on section 1263.320, subdivision (a).[17]

## D.   *Litigation Expenses Under Section 1250.410*

We finally consider the City's argument that the trial court erred in awarding litigation expenses to the Tongs under section 1250.410, subdivision (b).  That statute provides for a pretrial exchange of a final offer of compensation by the public entity and a final demand from the property owner "[a]t least 20 days prior" to a trial on compensation.  (§ 1250.410, subd. (a).)  If the court finds the plaintiff's final offer was unreasonable and the defendant's final demand was reasonable when "viewed in the light of the evidence admitted and the compensation awarded in the proceeding, the costs allowed . . . shall include the defendant's litigation expenses."  (*Id.*, subd. (b).)  "The purpose of section 1250.410 is ' "to promote settlement of valuation disputes in eminent domain proceedings and guarantee full recompense to the landowner in case of unnecessary litigation." ' [Citations.]  'Litigation is deemed unnecessary when it has resulted from unreasonable conduct on the part of the condemnor while the condemnee has been reasonable.' " (*City and County of San Francisco v. PCF Acquisitionco, LLC* (2015) 237 Cal.App.4th 90, 94; accord, *People ex rel. Dept. of Transportation v. Yuki* (1995) 31 Cal.App.4th 1754, 1763 (*Yuki*) [" 'A property owner who files a reasonable demand, but is required nonetheless to litigate because of the public agency's unreasonable position, can be fully compensated for his [or her] litigation expenses.  Conversely, a condemnor who makes a timely reasonable offer

---

[17] Since we have affirmed the trial court's valuation, we need not reach the merits of the Tongs' protective cross-appeal challenging the trial court's exclusion of their valuation evidence based on TDRs.

may avoid having to pay the property owner's expenses except for taxable costs.' "].)

Here, in compliance with section 1250.410, subdivision (a), the City filed its second final offer of compensation on May 14, 2021, maintaining its previous offer of $76,500, and the Tongs filed their final demand one week later, asking for compensation of $2.2 million, based on their $4.375 million valuation which relied on the possible use of the top portion of the bluff for multifamily residential, with TDRs. At the start of trial on June 11, 2021, however, the trial court concluded that it would exclude any valuation evidence of the Property based on TDRs. The matter was continued, and the Tongs filed a new valuation of $2 million, based on land banking in light of the possibility of the Project. They did not file an updated demand for compensation under section 1250.410, subdivision (a). The trial court ultimately valued the Property at $2 million.

Thereafter, the Tongs filed a motion under section 1250.410, requesting attorney fees of $312,920, expert witness fees of $4,590, and appraisal fees of $49,792. The trial court found the City's offer unreasonable and the Tongs' demand reasonable. It awarded the uncontested amount of $312,920 in attorney fees and $11,343.40 in costs. It adjusted the expert and appraiser fees downward slightly for a total of $48,346.20.

On appeal, the City asserts that the trial court erred as a matter of law in finding the Tongs' final demand for compensation reasonable because it asked for $2.2 million, which was $200,000 more than the amount of their amended valuation. It also contends that the trial court abused its discretion in finding its final offer unreasonable. We find no merit in either of the City's claims.

45

When determining entitlement to litigation expenses, the law instructs the judge to consider only the final offer and demand that were made "[a]t least 20 days prior to the date of the trial on issues relating to compensation." (§ 1250.410, subd. (a).) For purposes of the statute, " 'the trial on issues relating to compensation' means the trial in which the amount of compensation is determined." (*People ex rel. Dept. of Transportation v. Hansen's Truck Stop, Inc.* (2015) 236 Cal.App.4th 178. 183.) Here, the trial on compensation began with opening statements on June 11, 2021, immediately after the court excluded the Tongs' valuation evidence based on TDRs. Although the court allowed them to file a new valuation in light of its ruling, and continued the trial for that purpose, the Tongs could not have filed a new demand under section 1250.410, subdivision (a) because 20 days before trial had already passed.

Our high court has identified "[s]everal factors" that "have emerged as general guidelines for determining the reasonableness or unreasonableness of offers. They are ' "(1) the amount of the difference between the offer and the compensation awarded, (2) the percentage of the difference between the offer and award . . . and (3) the good faith, care and accuracy in how the amount of offer and the amount of demand, respectively, were determined." ' [Citation.] Thus, the mathematical relation between the condemner's highest offer and the award is only one factor that should enter into the trial court's determination." (*Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 720.) Moreover, reasonableness "should be determined in light of the facts as each party knew them at the time the offer and demand were made." (*People ex rel. Dept. of Transportation v. Gardella Square* (1988) 200 Cal.App.3d 559, 577–578 (*Gardella Square*).)

46

" ' " [R]easonableness of the final offer and demand presents factual issues . . . which are matters to be evaluated by the fact finder.' " ' " (*Escondido Union School Dist. v. Casa Sueños De Oro* (2005) 129 Cal.App.4th 944, 986.) Thus, " '[t]he trial court's determination of [reasonableness] will not be disturbed on appeal if supported by substantial evidence.' " (*Ibid*.) However, "if the uncontradicted evidence permits only one conclusion, the issue is legal, not factual." (*County of Los Angeles v. Kranz* (1977) 65 Cal.App.3d 656, 659.)

### 1.     Reasonableness of the Tongs' Demand

The City argues that the Tongs' $2.2 million demand was unreasonable as a matter of law because it was $200,000 *more* than the trial court could have awarded them at trial based on their updated valuation of $2 million. It also asserts that—since the Tongs' demand was for the "net sum of $2.2 million without adjustment, offset or other diminution for any taxes, attorneys fees, costs, or other costs, expenses, claims or offsets"—it was even more unreasonable because the City actually would have been agreeing to pay $2,411,523, the $2.2 million requested, plus the $211,523.35 the Tongs owed to the San Mateo County Tax Collector with respect to the Property. Finally, the City posits that, since the amount demanded was more than the valuation testified to at trial, it failed to account for any litigation risk.

It is true that, in an eminent domain case, the trier of fact "may not disregard the evidence as to value and render a verdict which either exceeds or falls below the limits established by the testimony of the witnesses." (*Aetna Life & Casualty Co. v. City of L.A.* (1985) 170 Cal.App.3d 865, 877.) Thus, the most the trial court ultimately could have awarded in this case was $2 million. But the City confuses limitations on the amount of a condemnation award with the reasonableness of the demand at the time it

47

was made.  (See *Gardella Square, supra*, 200 Cal.App.3d at pp. 577–578.)

The Tongs' final demand of $2.2 million was based on their $4.375 million

valuation which was subsequently excluded by the court on the first day of

trial.  At slightly more than half of the $4.375 million valuation on which it

was based, the demand was reasonable even if, when property taxes were

considered, the amount of the demand was actually $2,411,523.  It also

sufficiently accounted for litigation risk.  The trial court's determination that

the Tongs' demand was reasonable is thus supported by substantial

evidence.[18]

### 2.  Reasonableness of the City's Offer

In contrast, the City's final offer—$76,500, inclusive of interest and

costs and requiring each party to bear their own litigation expenses—was

manifestly unreasonable.  $76,500—the exact amount of the City's

valuation—was $1,923,500 below the $2 million award, or less than 4 percent

of the amount awarded.  In *Yuki, supra*, 31 Cal.App.4th 1754, the Sixth

Appellate District stated in this context:  "A survey of cases indicates that

final offers which are 60 percent or less of the jury's verdict are found to be

unreasonable while offers which are above 85 percent have been considered

reasonable per se.  Those in the middle range, as in this case, can fall within

---

[18] The City notes in passing that the Tongs' demand was unreasonable for failing to state whether interest was included as required by statute. (§ 1250.410, subd. (a).)  However, as stated above, the demand was for the "net sum of $2,200,000 without adjustment, offset or other diminution for any taxes, attorneys [*sic*] fees, costs, or other costs, expenses, claims or offsets." While not express, a reasonable reading of the demand was that the "net sum" included interest but excluded anything that would diminish the amount they received below $2.2 million.  This would have made the demand even more reasonable.  When viewed in light of the overall reasonableness of the demand, we do not find the Tongs' failure to expressly address interest to be meaningful.

either group, depending upon the other factors, particularly whether the government agency was unyielding and the extent of the 'good faith, care, and accuracy in the method of determination of offer and demand.' " (*Id.* at p. 1764, fn. omitted.)  At under 4 percent of the amount awarded, it is hard to argue the City's offer was reasonable.  This is especially true given that the amount offered was inclusive of interest and costs, even though the City had taken almost immediate possession of the Property.

Nevertheless, the City asserts that the trial court's determination that its offer was unreasonable was an abuse of discretion because the court was required to look at more than mathematics.  Specifically, it argues that it was confident in its valuation, it believed the Tongs' valuation was inadmissible, and the disparity between its offer and the final award was due to resolution of a purely legal issue.  We are not persuaded.

Arguably, under *Yuki*, we do not need to get to the " 'good faith, care, and accuracy' " of the offer given its absurdly low amount in relation to the court's ultimate award.  However, if we were to consider the City's good faith, we would find none.  The City's valuation was based on its conclusion that the Property—which it described as "actively collapsing into the sea"—had de minimis value even to a land banker because it was not developable.  In other words, this unique Property with panoramic and unobstructed ocean views was essentially worth nothing because it would need a seawall to allow its redevelopment and a private party could not construct a seawall to prevent further collapse, a situation the City's own expert described as a "catch-22." While we see many good reasons why bluff protection devices should be constructed by the government rather than a property owner, that does not mean the government should not be required to compensate landowners for their loss.

Despite these facts, the City was unyielding in its valuation throughout these proceedings. (Compare *County of Los Angeles v. Kranz, supra,* 65 Cal.App.3d at p. 660 [county valuation was unreasonable as a matter of law where it "should have realized that a jury would give some weight to the opinion of each expert, and fix the fair market value of the property somewhere between the two"; the landowners "came down more than half way on their demand"; but the county "stubbornly stuck to its own appraisal plus a small amount which would barely cover landowners' added costs of preparing the cause for trial"].) Moreover, since this amount was inclusive of interest and costs and the Tongs owed approximately $200,000 in back taxes, they would get nothing for the Property under the City's scenario. Indeed, in its posttrial briefing, the City suggested the Tongs *should* get nothing based on the $200,000 it would cost to remove the riprap at the base of the bluff, even though it had instructed its appraiser not to consider that cost in reaching its valuation.

Further, far from presenting a careful and accurate valuation, the City presented comparables which the trial court faulted because "*none* were in Pacifica*, none* were zoned R3, and *none* were located along the California coast with the exception of one sewerage property." Moreover, the City had not valued the parking easement. Indeed, the court found that the opinion of the City's appraiser "defie[d] common sense." This goes beyond a good faith dispute about a legal issue, as the City suggests. As stated above, we have found that substantial evidence supports the court's $2 million valuation even while agreeing with the City that the court violated the project influence rule. The City's stubborn refusal to accept that the Property might have some value and its low valuation based on a faulty analysis were

50

unreasonable, and the trial court did not abuse its discretion in finding them so.

### III.  DISPOSITION

The judgment is affirmed.  The Tongs are entitled to their costs on appeal.

HILL, J.*


WE CONCUR:


BANKE, ACTING P. J.


LANGHORNE WILSON, J.


A168115, A169273, A169714
*City of Pacifica v. Tong*

---

    * Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.